**Victor McCLAIN, Donald L. Edmonds, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 81–63, 81–75.**

District of Columbia Court of Appeals.

Argued Jan. 12, 1983.

Decided April 4, 1983.

---

Paul Regan, Washington, D.C., appointed by this court, for appellant McClain.

Sebastian K.D. Graber, Alexandria, Va., appointed by this court, for appellant Edmonds.

John R. Fisher, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell, and Donald J. Allison, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before KERN, NEBEKER and BELSON, *Associate Judges.*

KERN, Associate Judge:

Appellants were convicted after a jury trial, of armed robbery, D.C.Code §§ 22–2901, –3202 (1981). Appellant Edmonds challenges the admission of certain identification evidence at trial, and the sufficiency of the evidence to sustain the verdict against him. Both appellants contend that reversal is compelled by numerous other erroneous and prejudicial rulings and remarks made by the trial judge. Finding no error, we affirm the convictions.

I.

Two gunmen, accompanied by a third person who was never identified or taken into custody, robbed the Shipley Market in southeast Washington of some $10,000 on an August evening in 1979. The prosecution presented three principal witnesses at the trial in October 1980 to prove that appellants were the culprits: the owner of the Market, a security guard for the Market,

and the director of security for the shopping center in which the Market is located.

The owner testified that, on the evening in question, a person whom he recognized (and whom he had seen in the Market earlier that same day) came to his cash register and ordered him at gunpoint to lie on the floor while he (the robber) cleared it of cash. (Supp. Record at 111–13.) His assailant then followed him to the Market office and removed additional cash from the store safe. (Supp. Record at 113.) The owner was able to identify appellant McClain in open court as his assailant and further testified that he had previously selected McClain, from an array of photographs and at a lineup, as the man who had robbed him. (Supp. Record at 114–17.)

The Market's security guard described in his testimony how another person had approached him, pointed a pistol at him, and ordered him to lie on the floor. (Supp. Record at 141–42.) This second witness made no incourt identification of appellant Edmonds as the robber who had held a pistol on him, but he did recount from the witness stand how he had identified his assailant after the robbery from an array of color slides and at a lineup. (Supp. Record at 146–48.) Other evidence was presented which established that the particular man identified by the security guard was appellant Edmonds. (Supp. Record at 212–13, 215–16.)

The third and last eyewitness to the robbery, the director of security for the shopping center (who was the Market security guard's supervisor), testified that he entered the store while the robbery was in progress, and immediately confronted the gunman who was holding the security guard at bay with a pistol. (Supp. Record at 170–71.) He began grappling with the gunman, but at that point the other gunman who had been clearing out the store safe came running towards the doorway where he stood. (Supp. Record at 171–72.) A struggle ensued with the second gunman, during which the witness managed to dislodge some of the stolen money and the pistol from this robber. (Supp. Record at 173.) The witness later identified appellant McClain, at a lineup, as the second man with whom he had struggled; and he identified appellant Edmonds, from a slide array, as the person he had initially confronted upon entering the store. (Supp. Record at 175–77.) The witness also testified that he had encountered both men earlier that evening—shortly before the robbery—exiting a restaurant elsewhere in the shopping center. (Supp. Record at 169, 175.)

Prior to the trial, both appellants filed motions to suppress the identification evidence, and their motions were denied. At the close of the government's case, appellants both moved for a judgment of acquittal, and those motions were likewise denied. (Supp. Record at 237.) Both appellants then presented testimony of alibi witnesses. After trial, appellant Edmonds moved for a judgment notwithstanding the verdict based on the insufficiency of the evidence, which also was denied. (Record at 57, Supp. Record II at 3, Appellant Edmonds' Brief at 2.)

## II.

Appellant Edmonds' first assertion on appeal is that the trial court erred in denying his motion to suppress the identification testimony because it was the fruit of unnecessarily suggestive procedures and was unreliable.[1] *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Upon reviewing the

[1]. Specifically, he points out that in the slide array from which the security guard and the guard's supervisor identified him he is the only subject with a full beard and one of only three with a very dark complexion. (Supp. Record III at 2–11.) He also argues that in the lineup at which the security guard identified him he was the only person wearing prison denims, the only person with a full beard, and was positioned in the center of the line. (Supp. Record III at 12.)

record,[2] we are not persuaded that the identification procedures followed by the police were impermissibly suggestive or so unreliable as to violate appellant's due process rights.

■ When the trial judge ruled that there was no suggestivity that would affect the identification (Supp. Record at 99), he indicated that he had looked at the photographs of the slide array and the lineup. All of the individuals depicted in the slide array were black males of roughly the same age, height, and build. Several of them had facial hair, including at least one other than appellant who appeared to have a beard. Although appellant's complexion was the darkest, several others were fairly dark-complected. Nothing in the slide array would have directed a witness' attention to any particular individual. Accordingly, we find no basis for appellant's contention that the court erred in its judgment that the slide array was not suggestive.

■ Likewise, all of the individuals depicted in the photograph of the lineup at which the security guard identified appellant Edmonds were black males of approximately the same age, height, and build. Several of them were dark-complected; one other, standing next to appellant, had a full beard. Others had some facial hair. Since an even number of persons were used in the lineup, appellant's position as fifth in the line placed him near the center, but not directly centered, so the witness probably would not have focused on him any more closely than the others. However, appellant's clothing may have singled him out from the rest of the lineup. All of the participants in the lineup wore casual clothes. Several wore denim jeans. But we note that appellant was the only participant wearing a buttoned shirt, rather than a pullover sweater or zippered knit shirt. More importantly, appellant may have been attired completely in prison-issue blue, unlike any other person in the lineup.[3] Thus, it is at least arguable that the trial court erred in holding that there was no suggestivity in the lineup.

Nevertheless, even if the lineup contained an element of suggestivity because of appellant's clothing,[4] the trial judge properly admitted the identification testimony based on the lineup because it was reliable, given the totality of circumstances. *See Jennings v. United States,* 431 A.2d 552, 558 (D.C. 1981); *Cf. Patterson v. United States,* 384 A.2d 663, 666–67 (D.C.1978). At the pre-trial suppression hearing, there was testimony from the witness showing that he had focused his attention on his assailant and had ample opportunity to view him.[5] Although the witness' initial description of his assailant was very general, there was no indication of any later variance from that description. Nor was there any evidence at the suppression hearing that the witness was ever uncertain about the identification. He stated that he had made the identification based not only on facial hair, but also

2. Photographs made from the slide array, and a photograph of the lineup, were made a part of the record on appeal; and we have thoroughly examined them.

3. The photograph in the record before us was not a color photograph; we were unable to discern whether appellant was wearing a uniform shirt in the lineup.

4. Appellant also argued that the lineup procedures were suggestive because the security guard was alerted in advance of the lineup that the suspect would be in the line. The record shows this contention to be insubstantial. The witness was merely advised that, if he saw the robber in the line, he was to identify that person to the police. (Supp. Record at 46.)

5. The guard testified that he was approached from the front right side by his assailant and that he turned to face him squarely when he noticed the gun. (Supp. Record at 37–38.) He stated that he "just looked at [his assailant]" for some time before lying down on the floor. (Supp. Record at 28.) Even after he lay down, he testified, he continued watching the person holding him at bay, his attention so closely focused on the gunman that he was unaware of the robbery of the store owner occurring at the same time. (Supp. Record at 29.) Some lights were on in the store, and the witness and his assailant were positioned near a window. *Id.*

on facial structure, facial expression, and body size. (Supp. Record at 44.) Although the lineup was held some four months after the robbery, there was no evidence that the identification was not based upon the witness' recollection of the robbery. The witness had seen a photo array, a slide array, and two lineups, and had made positive identification only from the slide array and the second lineup. There was no evidence that the witness had failed to recognize appellant at either the photo array or the first lineup; and there was no evidence that the witness had ever identified anyone else as his assailant. Under these circumstances, the security guard's identification testimony was sufficiently reliable to be admitted as evidence.

### III.

We are also constrained upon a review of the record at trial to affirm the judge's refusal to grant the motion for judgment of acquittal by appellant Edmonds.

 In considering the claim of insufficient evidence, we must view the evidence in the light most favorable to the government, mindful of the jury's right to determine credibility, weigh the evidence, and draw justifiable inferences of fact. *Raymond v. United States,* 396 A.2d 975, 978 (D.C.1979); *Curley v. United States,* 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). The test for reversal is whether there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt. *Cunningham v. United States,* 408 A.2d 1240, 1242 (D.C. 1979); see *Crawford v. United States,* 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967). The standard is the same with respect to identification testimony as with other types of evidence, *Blango v. United States,* 373 A.2d 885, 887 (D.C.1977), although our review of a conviction based solely upon eyewitness identification testimony necessarily involves a close scrutiny of the circumstances surrounding the identifications.

 There were two witnesses in this case linking appellant Edmonds to the robbery; and one of them had positively identified appellant on two occasions. However, appellant urges that no reasonable juror could fairly have found guilt beyond a reasonable doubt because (1) neither witness made an in-court identification of Edmonds as one of the robbers, (2) both witnesses were uncertain of their identifications of Edmonds,[6] (3) no physical evidence was presented linking Edmonds to the offense, and (4) the identification testimony was too unreliable to be credited.

However, the Market security guard's testimony at trial showed that he made a careful observation of his assailant. When he was first approached by the gunman, he testified, "I looked at him, I just kept my eye on him . . . I just kept looking at him." (Supp. Record at 142.) He was facing his assailant from only a few feet away, and noticed his facial hair and complexion. (Supp. Record at 145, 152, 154.) Even after he lay on the floor, he stated, "I kept my eye on him all the time," (Supp. Record at 144), "trying to get a look at his face." (Supp. Record at 145.) Except for the area of his assailant's face which was covered by his sunglasses, (Supp. Record at 160–61), the witness was able to see his assailant's facial features, as well as his general body size, build, and complexion.

---

**6.** The security guard testified at one point during cross-examination that he selected Edmonds from the slide array based on his facial hair; that "[m]ost of the stuff [he] had forgotten." (Supp. Record at 161.) He also testified that he was "not really sure" of his identification of Edmonds at the lineup, (Supp. Record at 164), and his identification extended only to his saying Edmonds "looks like" his assailant.

(Supp. Record at 148.) The security supervisor testified that, although he identified Edmonds from a slide array, he was unable to identify him, two weeks before trial, in a photograph of the lineup at which the security guard had identified him. (Supp. Record at 200.) There was also testimony that the supervising guard had said he "didn't get a look at the guy." (Supp. Record at 214, 230.)

Even if a reasonable juror would have discredited the security guard's testimony, the identification testimony of the supervisor of security, who identified appellant Edmonds from a slide array, was sufficient in itself to sustain the verdict.

When this second witness entered the store, he immediately confronted the person he later identified as appellant Edmonds, holding the store guard at bay. He repeatedly stated at trial that he "just looked at him" initially, (Supp. Record at 170), then looked several times from the gunman's face to his gun and back again before a struggle began. (Supp. Record at 171.) He looked at the gunman for up to a minute, (Supp. Record at 194), standing abreast of him, at most only a foot away. (Supp. Record at 202.) During this time, he was able to see the gunman's full face, including his eyes, through his sunglasses, which he testified were not completely dark. (Supp. Record at 195–97.) He had had his attention drawn to both appellants when he saw them in the shopping center earlier that evening. (Supp. Record at 169, 175.) He had been a security officer since 1972 and had had special training in observation techniques. (Supp. Record at 192.) His identification of appellant Edmonds was made only a month and one half after the robbery and, according to his testimony at trial, was based on appellant's facial features, his height, and his size. (Supp. Record at 199, 229.)

The witness testified that he was "very positive" of his identification of appellant Edmonds as the gunman. (Supp. Record at 177.) The fact that he was unable to identify Edmonds in the lineup photograph shown to him only two weeks prior to trial was explained by him at trial as being due to the passage of a year's time since the robbery.[7] (Supp. Record at 177–78.) Considering these factors, any weaknesses in his observation and recollection of the gunman, and the meaning of his statement that he didn't "get a look" at the gunman, were matters of credibility for the jury.

In our view, there was evidence in this case from which the jurors could reasonably have found beyond a reasonable doubt that appellant Edmonds was one of the two men who committed the robbery.

## IV.

■ We turn now to the assertions by appellants concerning various evidentiary rulings and other actions taken by the court during the trial. First, we are not persuaded by appellants' arguments that the judge so interposed himself into the trial as to deny appellants a fair trial. While the court might well have been more patient on occasion, there is no pattern of its involvement so as to warrant reversal.

■ Appellant Edmonds also asserts error in the trial judge's refusal to allow the introduction of a police report to contradict the supervising guard's testimony that he had seen appellants prior to the robbery on the evening in question. He argues that the report contained an inconsistent statement made by the security supervisor to the effect that he had never seen either of the appellants in the area prior to the incident. First, we note that the statement was not necessarily inconsistent with the security director's testimony. When he made it he may very well have meant only that he had not seen them prior to the day of the robbery, when he saw them twice—first outside the restaurant, then in the Market.[8] Moreover, the extrinsic evidence of the earlier statement was properly excluded because no foundation was laid for it, as re-

---

7. While inability to identify two weeks before trial may be seen as weakening the force of this witness' identification testimony, it is also arguable that his failure to identify Edmonds at that point enhances the credibility of his earlier identification.

8. From a reading of the supervising guard's testimony under cross-examination, it is apparent that this is what he meant. (Supp. Record at 175.) For this same reason, then, we find no error in the court's refusal to give an impeachment instruction on this issue. (Supp. Record at 341–42.) The witness was not actually impeached.

quired, through questioning of the security director which would have permitted him to explain his statement. *Sellman v. United States,* 386 A.2d 303, 306 n. 5 (D.C.1978); *United States v. Wright,* 160 U.S.App.D.C. 57, 63, 489 F.2d 1181, 1187 (1973); *see* McCormick, *Evidence* §§ 28, 37 (E. Cleary 2d ed. 1972).[9]

▮ Appellant Edmonds also contends that the trial court erred in refusing to allow him to reopen his case after a three-day recess to present an additional alibi witness. Appellant testified at trial that he had spent the evening in question in his sister's apartment, with her, his brother, and his son; and that he had returned home late that night with his brother. His story was corroborated by testimony from two sisters, his brother, and his mother. There was no indication in the proffer that the additional alibi witness would have done more than duplicate the testimony already heard. (Supp. Record at 336–38.) Considering that appellant rested his case without requesting leave to reopen, considering that he had not sought a continuance to present additional testimony, and in view of the apparent cumulative nature of the proffered testimony, we do not believe that the trial court abused its discretion in declining to reopen the case. *See Sellars v. United States,* 401 A.2d 974, 978–80 (D.C.1979); *Baxter v. United States,* 352 A.2d 383 (D.C. 1976).[10]

▮ Appellant McClain maintains that the court erred in refusing to permit him to impeach the store owner's testimony by introducing a statement, signed by the store owner, which contradicted his testimony in court regarding whether he had said he had been instructed by the government

not to discuss the case with defense investigators. (Supp. Record at 124–26, 204–06.) The proffered statement, according to appellant, would have established the store owner's bias in favor of the government and a general lack of credibility. However, the decision whether to permit the introduction of particular evidence, or to exclude it for lack of relevance, is one committed to the discretion of the trial judge. *Mitchell v. United States,* 408 A.2d 1213, 1215 (D.C. 1979). Here we conclude that the court did not abuse its discretion.

In *Mitchell, supra,* we held that a witness' reluctance to cooperate with a defense investigator is not, alone, relevant to bias. In addition, insofar as the proffered evidence might have suggested governmental misconduct, appellant's contentions had already been heard and apparently [11] rejected at a pretrial hearing on his motion to compel the eyewitness to talk with defense counsel. (Record at 8.) *See Gregory v. United States,* 125 U.S.App.D.C. 140, 369 F.2d 185 (1966). Thus, any issue of alleged governmental misconduct had been resolved and was no longer a relevant issue at trial.

As to the value of the extrinsic evidence to impeach the store owner's credibility generally, the trial judge correctly ruled that it was precluded because it related only to a collateral matter; that is, it would not have been admissible independently for any purposes other than the contradiction. McCormick, *supra,* § 47, at 97–98; 3A J. Wigmore, *Evidence* § 1020 (Chadbourne rev. ed. 1970). In any event, appellant was not prejudiced since he was able to prevent the witness' possible untruthfulness to the jury through cross-examination. (Supp. Record at 124–25.)

9. The report was not offered into evidence following the security director's testimony, but at the close of all evidence. (Supp. Record at 331.) Nonetheless, the jury was informed of the possibly conflicting statement during counsel's extensive questioning of the police detective who took the report. (Supp. Record at 225–29.)

10. Appellant argues that the proffered witness' testimony would have enhanced the credibility

of his alibi defense because she was unrelated to him. However, it is not clear that she was, in fact, unrelated to him. The government contends that she was his girlfriend and the mother of his child.

11. The transcript of that proceeding, March 12, 1980, was not made a part of the record on this appeal. However, the docket shows that the motion was denied.

■ We also reject appellant McClain's contention that the trial court should have required the government, under the Jencks Act, 18 U.S.C. § 3500 (1969), to provide him with portions of a transcript of the pretrial *Gregory* hearing.[12] Appellant has cited to no precedent requiring the government, under the Jencks Act, to produce a transcript from stenographic notes of a court proceeding.[13] Such materials, as a matter of public record, are equally available to the defense. The transcript was not requested until the day of trial, (Supp. Record at 10–12), and then there was no claim that it was in the government's possession or that it would relate to the subject matter of testimony to be adduced at trial, such that the Jencks Act would apply. *See* 18 U.S.C. § 3500(b). In fact, it pertained only to the issue of the store owner's unwillingness to cooperate with a defense investigator, a matter which, as we have discussed, *supra,* at 569, had been resolved by the earlier hearing and was no longer a relevant issue at trial.

■ Finally, appellant McClain argues that he was denied the right to present an effective defense because (a) he was not permitted to rehabilitate alibi witnesses by introducing signed statements given by them to defense investigators; and (b) his counsel was not permitted to introduce, at the time of his choosing, a weather report corroborating his alibi.

(Supp. Record at 311–12.) Both arguments are unpersuasive. Although cross-examination of appellant's alibi witnesses was primarily designed to suggest to the jury that they could not have remembered in detail the unremarkable events of the day in question, and may have had motives to testify in favor of appellant, the witnesses were not impeached by any specific suggestion of fabrication. Furthermore, the statements were not made before a motive to fabricate had arisen. The prior consistent statements were thus properly excluded. *Musgrove v. United States,* 441 A.2d 980, 985 (D.C.1982); *Rease v. United States,* 403 A.2d 322, 327–28 (D.C.1979) (per curiam).[14] The weather report was admitted into evidence at the close of the defense case, (Supp. Record at 331), and its purpose was fully argued to the jury in closing argument. (Supp. Record at 365.) Hence, the error in the delayed admission of the weather report, if any, was harmless.

In sum, the trial court committed no reversible error in any alleged respect.

*Affirmed.*

---

12. *See supra,* at n. 11. Appellant's counsel was present at that hearing and waived his appearance.

13. In the analogous cases involving an indigent's right to a free transcript, some showing of need has been required. *E.g., Kleinbart v. United States,* 426 A.2d 343, 358 (D.C.1981) (claim of ineffective assistance of counsel); *United States v. Brown,* 143 U.S.App.D.C. 244, 245, 443 F.2d 659, 660 (1970) (claim under 18 U.S.C. § 3006A); *Nickens v. United States,* 116 U.S.App.D.C. 338, 341, 323 F.2d 808, 811 (1963), *cert. denied,* 379 U.S. 905, 85 S.Ct. 198, 13 L.Ed.2d 178 (1964). In this case, no representation whatsoever was made to the trial judge that the transcript was needed for any particular reason. (Record at 12.) Further, the *issues at the* pretrial hearing were not complicated, the hearing apparently was brief, and

appellant was represented by the same attorney as represented him at trial.

14. *Johnson v. United States,* 434 A.2d 415 (D.C. 1981), relied upon by appellant, is distinguishable. It involved a witness who had been impeached specifically by a prior inconsistent statement and by suggestion of a specific motive to fabricate, which could have been rebutted by specific facts in and surrounding the prior consistent statement. The court expressly found that those facts would have been "of clear help to the factfinder in determining whether the witness [was] truthful." *Id.* at 421, quoting *United States v. Sampol,* 204 U.S. App.D.C. 349, 401, 636 F.2d 621, 673 (1980). In this case, the prior statements apparently would have been a mere repetition of the witnesses' testimony, taken several months after the robbery. (Supp. Record at 292.)