John JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–936.

District of Columbia Court of Appeals.

Argued Sept. 25, 2003.
Decided Aug. 4, 2005.

---

Bradford P. Johnson, Washington, DC, appointed by the court, for appellant.

Tracy N. Ferguson, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, June Jeffries, and John Interrante, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FARRELL and REID, Associate Judges.

REID, Associate Judge:

The only issue presented on appeal in this homicide case is whether the trial court properly denied appellant John Jones' motion to suppress identification testimony.[1] Mr. Jones contends that "he

---

1. Mr. Jones was indicted on the following charges: first-degree felony murder (of Valjean Pledger and Claudia Berry) while armed and first-degree murder while armed (of Ms. Pledger and Ms. Berry), in violation of D.C.Code §§ 22–2401, –3202 (1996), recodified at D.C.Code § 22–2101, –4502 (2001); assault with intent to kill (Renita Ross) while armed, in violation of §§ 22–501, –3202, recodified at §§ 22–401, –4502 (2001); first-degree burglary while armed (intent to steal property and intent to commit assault), in violation of §§ 22–1801(a), –3202, recodified at §§ 22–801(a), –4502 (2001); kidnapping while armed, in violation of §§ 22–2101, –3202, recodified at §§ 22–2001, –4502 (2001); attempt to commit robbery (of Ms. Pledger and Ms. Berry) while armed, in violation of §§ 22–2902, –3202, recodified at §§ 22–2802, –4502 (2001); possession of a firearm during a crime of violence ("PFCV"), in violation of § 22–3204(b), recodified at § 22–4504(b) (2001); and carrying a pistol without a license ("CPWOL"), in violation of § 22–3204(a), recodified at § 22–4504(a) (2001). He was found guilty of first-degree felony murder (of Ms. Pledger and Ms. Berry) while

was denied his rights under the [Fifth] Amendment to the Constitution because [ ] the pretrial identification procedures used by the police were unduly suggestive and unreliable." Discerning no error, we affirm the judgment of the trial court.[2]

### FACTUAL SUMMARY

The government presented the testimony of Metropolitan Police Department ("MPD") Detective Don Juan Monroe at the hearing on Mr. Jones' motion to suppress identification testimony.[3] According to that testimony, on January 1, 1999, Mr. Jones and another man went to a rooming house in the 1500 block of Eighth Street, in the Northwest quadrant of the District of Columbia where Valjean Pledger maintained a room. In addition to Ms. Pledger, Valerie Berry and Renita Ross were in the room at that time. When the two men were unable to find any money or cocaine in the room, Mr. Jones instructed his accomplice to shoot the three women. Ms. Pledger and Ms. Berry were fatally wounded. Ms. Ross stated that the accomplice "put the gun to [her] head and [she] heard a click. And [the accomplice] said you're lucky."

Detective Monroe did not speak with Ms. Ross on the day the murders occurred, January 1, 1999. However, at the suppression hearing he testified that De-

tective James Francis took her statement at approximately 7:00 p.m. that day. Detective Monroe reviewed the statement at trial and responded to questions by the prosecutor. Ms. Ross was asked on January 1, 1999, whether "she had ever seen the [d]efendant before." Her answer was "No. But his cousin does my hair and his name is Rickie Alexander—Richie Alexander . . . . She stated that she knew [the defendant's] name as David,"[4] and as of January 1, 1999, had known him "about three days." She indicated that David had visited "the house three days in a row" with some drugs (cocaine, heroin, crack). She described David as "a black male, in the thirties, 5′ 7″, medium build, medium brown, short hair, no hair on his face, face looked rough." Ms. Ross responded "yes" when asked "if [she were] show[n] some pictures, could [she] pick out David?"

On January 6, 1999, Detective Monroe spoke with Ms. Ross who, at the time, was in a District of Columbia "Rehab Center." In the presence of three other law enforcement officers, he showed her six black and white pictures which included the most recent available photograph of Mr. Jones. Ms. Ross was unable to identify any of the six pictures as that of the assailant. Detective Monroe then retrieved from his vehicle a sheet of nine photographs in color, with front and side views of each per-

armed; the lesser-included offense of second-degree murder (of Ms. Pledger and Ms. Berry) while armed; first degree-burglary while armed (intent to assault); PFCV; and CPWOL. He was acquitted of first-degree burglary while armed (intent to steal); kidnapping while armed; attempt to commit robbery while armed; and first-degree murder (premeditated) while armed (of Ms. Pledger and Ms. Berry). The jury deadlocked on the charge of assault with intent to kill (Renita Ross) while armed. Mr. Jones received a combined sentence of 101 years and nine months in prison, with a mandatory minimum sentence of seventy-five years.

2. After oral argument in this matter, we issued an order *sua sponte* requesting the trial transcript containing the testimony of government witness Renita Ross, and subsequently issued an order on *October 1, 2003*, giving the parties an opportunity to file supplemental briefs. No supplemental briefs were filed.

3. Detective Monroe's testimony was based in part on a statement from Ms. Ross taken by MPD Detective James Francis on the night of the murders.

4. In her January 1, 1999 statement, Ms. Ross said she knew the appellant's name as "David."

son. Upon seeing this photo array, Ms. Ross immediately identified Mr. Jones' photograph. She commented: "That's him, his face look[s] rough." Mr. Jones was the only person whose picture was included in both the first and second photo arrays. Detective Monroe spoke with Ms. Ross on an unspecified day after her photo identification of Mr. Jones, and she "stated that [Mr. Jones] had a rough pocked marked style face. His face looked real rough like he had a lot of holes in his face."

In support of the motion to suppress, counsel for Mr. Jones argued at the suppression hearing "that it is clearly suggestive to first give someone a photograph and then show them another set [of photographs] with only that one individual in that group." Counsel also stated that the first photo array had no "identifying characteristics showing that these were people that had prior criminal records or that were locked up," but that the second array contained a Police Department identification number, thus "associat[ing]" Mr. Jones with "some type of police record." And, counsel contended that "indications of the possibility of a mis-I.D." stemmed from Ms. Ross "being under the influence of drugs."

The trial court stated that it did not "need a response from the [g]overnment", and concluded that the photographs and the procedures used during the photo array viewed by Ms. Ross were not suggestive. The court noted difficulties with the picture of Mr. Jones in the first array— "his eyes are partially closed . . . [and] the photograph is more washed out than all of the other photographs . . . And also Mr. Jones looks heavier in this photograph than he appears in the subsequent photograph and as he appears in [c]ourt today." In addition, the trial court discounted the influence of any drugs on Ms. Ross' identification:

And to the extent the witness may have been under the influence of drugs, I'm not sure how drugs affect her ability to observe. For some people it may, in fact, make her power of observation keener or she may have sobered up immediately after she realized she was no longer in a safe environment. But she appeared to have a basis for her identification given that she knew the Defendant by a name and had seen him on two earlier occasions. And she had a good opportunity to observe. So in any event, there appears to be an independent basis for the identification. So the Motion to Suppress her identification is denied.

At trial, Ms. Ross made an in-court identification of Mr. Jones. She testified that she had picked "David's" picture out of the photo array shown to her and that she had no doubt that "David" was the person who accompanied "the gunman" on the day of the shootings. As she put it: "I just knew that it was him," but she did not "remember anything about how he looked in the picture." She met Mr. Jones, whom she knew as "David" or "Bugaloo" sometime in 1998. During the last week of December 1998, she was staying with Ms. Pledger, and she saw Mr. Jones in Ms. Pledger's room on the Monday and Wednesday before the shooting. She was able to see his face clearly, and recognized him on Wednesday as the same person who was there on Monday. On Friday, January 1, 1999, Mr. Jones again returned to Ms. Pledger's residence. The day before his return, Ms. Ross had "[c]leaned up, made some black eyed peas, washed clothes, drunk some champagne . . . [and] smoked [some crack]." Sometime on the morning of January 1, she fell asleep.

Ms. Pledger woke Ms. Ross up later on January 1 to search for a phone book. Upon hearing a knock on the outside door

of the rooming house, Ms. Ross went to that door, "peeped out the peephole" and saw Mr. Jones clearly. She returned to Ms. Pledger's room and informed her that it was Mr. Jones. Ms. Pledger responded, "Tell him I'm not here." Ms. Ross refused to return to the outside door saying, "I ain't telling him nothing." Ms. Berry, who also was in Ms. Pledger's room, went to the door to convey the message to Mr. Jones. Ms. Ross heard her say, "Why you doing that?" Then Ms. Ross heard Mr. Jones' voice at the door; he asked to speak with Ms. Pledger. Ms. Ross told him she was not there. Mr. Jones was able to open the door, and Ms. Pledger told him to "[g]et out." At that point another man entered the room; Ms. Ross did not know him. Mr. Jones "pulled" Ms. Berry into the room and shut the door. There was sufficient light for Ms. Ross to recognize Mr. Jones. His face "looked rough." Mr. Jones confronted Ms. Pledger and demanded drugs. The man with him pulled out a gun. Mr. Jones searched Ms. Pledger's person and the drawers in her room. Ms. Ross kneeled on the floor and put her head down. Eventually, she "heard . . . some shots . . .[,] falls and . . . another shot." "And then somebody put the gun to [her] and they pulled the trigger." The gun did not go off. After the shootings and the departure of the assailants, Ms. Ross ran to an upstairs apartment, kicked the door in, and ran to the window to get someone's attention. The occupant of the apartment soon appeared and assisted her. A call was placed to the police.

In response to the prosecutor's questions, Ms. Ross confirmed that she had a criminal record, including 1991 convictions pertaining to distribution or attempted distribution of cocaine, and a 1993 conviction for shoplifting. She began using drugs—marijuana, crack cocaine, and PCP—at the age of sixteen. She developed a daily habit of ingesting cocaine, at a cost of $250 to $300 per day. Ms. Pledger supplied crack cocaine to her.

Government counsel posed a series of questions to Ms. Ross regarding the effect cocaine had on her body generally and on the day of the murders. She replied that the drug generally prompted her to clean her surroundings, and did not affect her vision, hearing, understanding or memory. After she slept on the morning of the murders, Ms. Ross did not ingest any drugs or alcoholic beverage. She had no trouble with perception, hearing loss or hallucinations. She stopped using drugs after her friends (Ms. Pledger and Ms. Berry) were killed, and sought treatment for her addiction.

## ANALYSIS

Mr. Jones argues that "the photographic identifications of [him] were profoundly unreliable"; and that "the police used an unnecessarily suggestive photo array because the photographs revealed dates that enabled . . . Ms. Ross[ ] to determine who was the perpetrator of the alleged crime that took place on January 1, 1999." Furthermore, Mr. Jones asserts that "[his] photo appeared in two arrays, and any astute witness who viewed this array easily could have adduced that Mr. Jones was the perpetrator of the crime." He also claims "that Ms. Ross was an unreliable witness who was a user and perhaps even a distributor of drugs," and he raises due process concerns, as well as assertions that the identification "lacked probative value." The government maintains that the photo array was not unduly suggestive since "[e]ach array was comprised of similar photographs identical in format and content," with "men of the same race, complexion, [and] with short hair and mustaches." Mr. Jones had a different appearance in both arrays. In one, his eyes were partly closed, and in the other, they were

open. He was heavier in one than in the other, and the photo in the first array did not reveal clearly the rough skin which was important to Ms. Ross' identification. In addition, the government maintains that under the factors used to assess the reliability of a witness' identification, "Ms. Ross' out-of-court identification of appellant was reliable."

 " 'This court is bound by the trial court's findings on whether identification procedures were impermissibly suggestive and whether an identification was reliable if they are supported by the evidence and in accordance with the law.' " *Black v. United States*, 755 A.2d 1005, 1008 (D.C. 2000) (quoting *Turner v. United States*, 622 A.2d 667, 672 n. 3 (D.C.1993)). In *Smith v. United States*, 777 A.2d 801 (D.C. 2001), we reiterated the two questions essential to an analysis about whether the procedures accompanying a photo array were unduly suggestive and unreliable:

(1) Was the identification procedure "unnecessarily suggestive and conducive to irreparable misidentification"?

(2) If so, given the "totality of circumstances," was the resulting identification reliable nonetheless?

*Id.* at 805 (citing *Buergas v. United States*, 686 A.2d 556, 558 (D.C.1996) (other citations omitted)). With respect to the first question, "we examine whether some related circumstances or something in the [photo] array would have directed the witness' attention to any particular individual." *Smith*, at 805–06 (citing *Buergas, supra*) (quoting *McClain v. United States*, 460 A.2d 562, 566 (D.C.1983) (quotation marks omitted)). Furthermore,

[E]ach case must be considered on its own facts, and ... convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly sugges-

tive as to give rise to a very substantial likelihood of irreparable misidentification.

*Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). With regard to a determination of reliability, we look to the following factors:

(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witnesses' degree of attention, (3) the accuracy of [the witness'] prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.

*Black, supra*, 755 A.2d at 1008 (quoting *Long v. United States*, 687 A.2d 1331, 1337 (D.C.1996)); *see also Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

 We turn first to Mr. Jones' argument that the identification procedure used by the police was "unnecessarily suggestive." The Supreme Court has cautioned that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *See Simmons, supra*, 390 U.S. at 383, 88 S.Ct. 967. The "danger [of misidentification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person [the witness] saw, or if [the police] show [the witness] the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." *Id.* (footnote omitted).

Based upon our review of the suppression hearing transcript, the trial court's ruling on the suppression motion, the testimony of Ms. Ross at trial, the exhibits containing the two photo arrays, and pertinent case law, we conclude that the photo array procedure followed in this case was not unnecessarily suggestive, nor conducive to irreparable misidentification, even

though appellant's photo was the only one that appeared in both the first and second array.

The first set of pictures, from which Ms. Ross made no identification, consisted of six black and white photos of black males showing a frontal view only. The males in the first array had no facial hair except for a slight moustache, and all had short haircuts. Unlike the eyes of the others shown in the first array, the eyes of Mr. Jones appear to be droopy or slightly closed. The second array contained eighteen color photos of nine black males, with both a frontal and a side view. Mr. Jones was the only person included in both arrays. He is thinner in the second array, which was taken at an earlier point in time than his picture in the first array. The men in the second array were approximately the same age, had short haircuts, and a slight moustache. Ms. Ross identified Mr. Jones by his "rough pocked marked style face." As she also said during the suppression hearing: "His face looked real rough like he had a lot of holes in his face."

This case is unlike *Henderson v. United States*, 527 A.2d 1262 (D.C.1987), in which we determined that the identification procedure was "unnecessarily suggestive" because:

> Appellant's photograph stands out dramatically for several reasons. First, the quality of the photographic print is quite poor. Appellant's face has a light, almost completely washed out appearance. All the other photographs represent proper exposures of medium or dark complected black men. Second, aside from small moustaches on some of the men, appellant is the only individual with facial hair—a full beard. Third, appellant is shown as substantially bald, while all the other men exhibit normal hairlines (although several of them have their hair cut close to the scalp). Finally, the date shown on appellant's mug shot is 1984, while all the others date from the early to mid 1960s except for one dated 1979.

*Id.* at 1268. In contrast to the array in *Henderson*, appellant's photograph does not "stand out dramatically" in either the first or the second photo array shown to Ms. Ross. Nor is it apparent from the first array that Mr. Jones is included in the second array. The trial court found that his picture in the first array shows a heavier young man than that in the second array. It is true that in the first array Mr. Jones has partially closed eyes, and the trial court determined, as it did in *Henderson, supra,* that Mr. Jones' picture in the first array "is more washed out than all the other photographs." But the other distinctions found in *Henderson* are not present in this case. The lack of a clear picture of Mr. Jones in the first array was significant only because Ms. Ross based her identification in large measure on the texture of Mr. Jones' face, which had a pock marked appearance, and his face was not clear in the first array. Since Mr. Jones' appearance in the first photo array was different from that in the second, and because the men depicted in each photo array were similar in size and appearance, based upon our review of the record, we cannot conclude that Mr. Jones' picture exhibited in the first array " 'would have directed [Ms. Ross'] attention" ' to his photo in the second array, or that he stood out dramatically in either photo array. *Henderson, supra,* 527 A.2d at 1268 (quoting *McClain, supra,* 460 A.2d at 566). Indeed we disagree with Mr. Ross' argument that "any astute witness who viewed [the second] array easily could have deduced that Mr. Jones was the perpetrator of the crime."

In a somewhat similar case, *Stewart v. Duckworth*, 93 F.3d 262 (7th Cir.1996), a witness was shown three photo arrays. The appellant was the only person who

appeared in all three photo arrays. The Seventh Circuit affirmed the District Court's ruling that the identification procedure was not unduly suggestive. Both the District and the appellate courts determined that appellant's "photo did not stand out in the arrays," *id.* at 265, and a "critical factor" was that his "photograph in the first group looks very different from his photograph in the second." *Id.* The photograph from which the witness in *Stewart* identified the appellant was taken at a point in time "very soon after the crime," *id.* at 266, but that from which Mr. Jones was identified in this case was an earlier picture than in the first array shown to Ms. Ross. That factor does not distinguish the present case from *Stewart*, however, because as the trial court found, Mr. Jones actually appeared less heavy at the time of his trial than his picture in the first photo array. And, the record in this case apparently does not show the exact date on which Mr. Jones' pictures, shown in both arrays, were taken. Furthermore, in *United States v. Carter*, 410 F.3d 942 (7th Cir.2005), the Seventh Circuit reiterated that: " '[T]here is nothing per se impermissible about placing the same suspect in two different identification procedures' especially when there is a 'substantial passage of time' between the two showings." 410 F.3d at 949 n. 12 (citation omitted). Although there was no "substantial passage of time" between Ms. Ross' viewing of the first and second photo array, we see nothing in this case to suggest that it was "per se impermissible" to include Mr. Jones' picture in both photo arrays.

We are not persuaded by Mr. Jones' cursory argument that "the police used an unnecessarily suggestive photo array because the photographs revealed dates that enabled the witness, Ms. Ross, to deter-

mine who was the perpetrator of the alleged crime that took place on January 1, 1999." During oral argument Mr. Jones' counsel stated that the date "1994" appeared only on Mr. Jones' photo in the second array and that the dates on the other photos are more recent, but he did not explain the significance of this date in relation to January 1, 1999, the date on which the crimes were committed; nor did counsel explain how this date would have prompted Ms. Ross to select Mr. Jones' picture. Most significant, however, since Ms. Ross immediately identified Mr. Jones' picture as the assailant when she saw it in the second array display, there is no indication that she even focused on the dates.[5] In sum, we conclude that the photo identification in this case was not "unnecessarily suggestive and conducive to irreparable misidentification." *Smith, supra,* 777 A.2d at 805.

Mr. Jones also argues that Ms. Ross' identification was unreliable because "the testimony at trial revealed nothing to indicate the length of time the witness had to observe Mr. Jones, the certainty or the reliability of that identification, the state of mind or condition of the witness, or her degree of certainty." With respect to Ms. Ross' "state of mind," he argues that she "was a user and perhaps even a distributor of drugs." Furthermore, he maintains that the first photo array tainted Ms. Ross' in-court identification of him, and therefore it was unreliable. The government argues that "given the totality of the circumstances, Ms. Ross's out-of-court identification of [Mr. Jones] was reliable and the trial court thus properly admitted it into evidence." We agree.

Ms. Ross had an opportunity to view Mr. Jones before and during the crimes.

---

**5.** All of the dates on the pictures in the second photo array are not readily visible on the exhibit presented to the court.

Nothing in the record suggests that she did not have sufficient time to observe Mr. Jones. During the week of the murders, Ms. Ross saw Mr. Jones twice prior to the shooting of Ms. Pledger and Ms. Berry. She saw his face clearly. On the day of the murders, when she heard a knock at the door she "peeped out the peephole" and saw Mr. Jones. When Ms. Berry finally opened the door and let Mr. Jones in, it was light outside and the light inside the apartment was sufficient to enable Ms. Ross to recognize him. Thus, in terms of the first factor reiterated in *Black, supra,* Ms. Ross had "the opportunity . . . to view [Mr. Jones] at the time of the crime."

Mr. Jones implicitly argues that Ms. Ross' use of drugs around the time of the shootings deprived her of the "degree of attention" necessary to ensure the reliability of her identification. But the record shows that at 7 p.m. on the day of the murders, Ms. Ross described the assailant to Detective James Francis in detail. She stated that he was "a black male, in the thirties, 5'7", medium build, medium brown, short hair, no hair on his face, face looked rough." And, the trial court specifically found that despite the drugs, Ms. Ross "appeared to have a basis for her identification given that she knew [Mr. Jones] by a name and had seen him on two earlier occasions." Ms. Ross testified that she slept after ingesting the crack cocaine, and did not ingest any drugs or alcohol that morning after waking up. She stated that drug usage did not affect her vision, hearing, understanding or memory, and that she had stopped using drugs and sought treatment after her friends were killed. Hence, on this record Ms. Ross' "degree of attention" before and after the murders support the reliability of her identification. Mr. Jones also questions whether the fourth factor set forth in *Black, supra,* was met—"the level of certainty." When she saw the second photo array, however, Ms. Ross immediately and without hesitation identified Mr. Jones' picture as that of the assailant.

Mr. Jones does not dwell on the third and fifth factors articulated in *Black,* "the accuracy of [the witness'] prior description of the criminal" and "the time between the crime and the confrontation." Evidence presented at trial, however, shows that both of these factors are met in this case. The detailed physical description which Ms. Ross gave to Detective James on the day of the murders matched his facial appearance in his picture in the second photo array. Moreover, the photo identification took place on January 6, 1999, five days after the murders. And, we do not agree with Mr. Jones that the photo array tainted Ms. Ross' in-court identification of him. At any rate, her in-court identification had a basis that existed prior to her photo identification, that is, her observation of Mr. Jones twice before the murders and on the day of the murders. In short, we are satisfied that the trial court did not err in concluding that Ms. Ross' identification of Mr. Jones was reliable and properly admissible into evidence. *See Black, supra,* 755 A.2d at 1008; *see also McCoy v. United States,* 781 A.2d 765, 770 (D.C. 2001).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*