Elmer CAMPOS–ALVAREZ and
Marta Campos, Appellants,

v.

UNITED STATES, Appellee.

Nos. 08–CF–669, 08–CF–875.

District of Columbia Court of Appeals.

Argued Sept. 27, 2010.
Decided April 7, 2011.

Jessica Brand, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant Campos–Alvarez.

Ferris R. Bond, Washington, for appellant Campos.

Elizabeth H. Danello, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, and Roy W. McLeese III, Daria J. Zane, and Jennifer A. Kerkhoff, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

GLICKMAN, Associate Judge:

Appellants Elmer Campos–Alvarez and Marta Campos were tried together before a jury on charges arising out of a gang-related shooting. The jury found Elmer Campos–Alvarez guilty of assault with intent to kill while armed, aggravated assault while armed, three counts of assault with a dangerous weapon, and several related weapons offenses. It found Marta Campos guilty of obstruction of justice and conspiracy to obstruct justice. Although appellants raise several grounds for reversal, for the most part we affirm their convictions.

## I. The Evidence at Trial[1]

### A. The Shooting

On the evening of August 5, 2002, Kenny Loza, his uncle Noel Loza, and his friend Javier Morales were attacked outside an apartment building in Northwest Washington, D.C. They were coming out of the building together when two men entered the driveway. At trial, Kenny Loza and Morales identified appellant Elmer Campos–Alvarez as one of the two men.

According to Kenny Loza, Campos–Alvarez confronted him, uttered a few angry words, pulled out a gun, and started shooting. Kenny was shot in the back and collapsed near where he had been standing. Noel Loza testified that Campos–Alvarez and his companion "shot directly at my nephew [Kenny] first, and then they shot at me as we were running." Noel managed to escape inside the apartment building, though he sustained gunshot wounds to his arm, knee, and hip. Javier Morales, who was standing somewhat apart from Kenny and Noel when the shooting began, also made it back inside the building, after first taking refuge behind a parked car and firing his own gun at the two assailants. "[E]verything happened so fast," Morales testified.

---

1. Except as otherwise indicated, the evidence we recount was introduced by the prosecution. Neither appellant testified in his or her defense.

Other witnesses saw the shootings but could not identify the attackers. James Bryant was in the lobby of the apartment building when the gunfire erupted. He heard multiple gunshots and saw yellow flashes outside, which appeared to come from the driveway. Bryant was injured by glass fragments from the shattered front door. Jose Benitez also heard multiple gunshots as he and his daughter left the building and rushed back inside. Terrence Burnett was parking his jeep in front of the building when he heard the shots and saw sparks flying from the hands of two young men.

## B. The Motive

Over defense objection, the government presented evidence at trial that the motive behind the assault on the Lozas and Javier Morales was gang-related. Kenny Loza and Morales were members of Vatos Locos, a Salvadorian gang. Appellant Campos–Alvarez belonged to Mara R (also called La Raza), a different Salvadorian gang. In the summer of 2002, Mara R was involved in a violent feud with Vatos Locos. Roque Lopez, a former Mara R gang member, testified at trial that Vatos Locos had "done a lot of shootings to us," and that Vatos Locos leader Oscar Chavez had killed a man named Walter Villatoro. Although Villatoro was not an actual member of Mara R, he had affiliated himself with that gang, and he was a friend of Campos–Alvarez.

According to Roque Lopez, Campos–Alvarez and his friend Jaime Alvarez visited him early in the evening on August 5, 2002. Campos–Alvarez invited Lopez and his acquaintance Jose Luca "to go take revenge from the V.L. people," and said he planned "to go shooting" at a nearby location where Vatos Locos members gathered. Lopez declined the invitation. He talked with Campos–Alvarez again some time after the shooting. Campos–Alvarez "told me that they went into the building where the V.L. people was [sic]," Lopez testified, "and that they saw the V.L. people, and they began shooting." Campos–Alvarez purportedly identified one of the Vatos Locos targets as Javier Morales and said that they shot at will and "didn't care who they g[o]t." Campos–Alvarez also asked Lopez whether Kenny Loza was alive or still in the hospital.

## C. Attempts to Prevent Kenny Loza's Testimony

Campos–Alvarez was not arrested until 2006. His former girlfriend, Miradis Viera–Miranda, visited him while he was in the D.C. Jail awaiting trial. She testified that Campos–Alvarez asked her to offer Kenny Loza $5,000 to induce him not to appear in court. Campos–Alvarez renewed this request when Viera–Miranda visited him again in January 2007. He was angered when Viera–Miranda later told him that she "didn't want to get involved in nothing."

Appellant Marta Campos, Campos–Alvarez's sister, telephoned Viera–Miranda repeatedly to press her about contacting Kenny Loza. Campos left several voice mail messages for Viera–Miranda, who usually did not pick up the phone because she "didn't want to get involved." Sometimes Campos and Campos–Alvarez were on the call together to ask Viera–Miranda to help "them" out. On one occasion, Marta told Viera–Miranda that she and Campos–Alvarez were going to give her three thousand dollars "to get in contact with Kenny."

Viera–Miranda testified that in some of the phone calls, made between January and April 2007, Campos specifically asked her to "offer" Kenny Loza "money so he won't come to court." Kenny Loza confirmed at trial that Viera–Miranda in-

formed him that Marta Campos "told her to call me to offer me money so I wouldn't come to court to testify against [Campos–Alvarez]." According to Viera–Miranda, Campos–Alvarez insisted to her "that he was innocent," and she professed to believe that the money was being offered to prevent an innocent man (Campos–Alvarez) from being convicted.

Marta Campos also approached Javier Morales's cousin, Melvin Morales, to obtain Kenny Loza's telephone number and address. Melvin's sister Elizabeth Morales overheard Campos tell him she "wanted to speak to Kenny to offer him money to not show up to court." Kenny Loza recalled talking with Elizabeth Morales about Campos's efforts to give him money "[n]ot to come testify against [Campos–Alvarez]."

Melvin Morales, who was the brother of Vatos Locos leader Enrique Morales, was called at trial as a defense witness. He testified that Marta Campos asked him to tell Kenny Loza to be sure her brother was the shooter if he was going to testify against him in court.[2] If Loza was certain, then he should "go to court and do what he got to do." But if he was not sure Campos–Alvarez shot him, or was not going to testify truthfully, then he should not go to court "because why would he want to get someone in jail for something they didn't do." If everything "went well" and the case was dismissed, Morales testified, Kenny Loza could "probably get some money" from Campos–Alvarez.

## II. Elmer Campos–Alvarez's Claims on Appeal

### A. Admissibility of Evidence of Gang Activity

■ Campos–Alvarez's main contention on appeal is that the trial judge erred in admitting the evidence of his membership in Mara R and the violent rivalry between Mara R and Vatos Locos. Campos–Alvarez argues that this evidence was unnecessary to advance the government's case and served only to inflame the jury against him. According to Campos–Alvarez, guilt by association subverted his defense. We disagree.

The admissibility of the evidence of gang membership and activity was raised in advance of trial. The government moved for leave to introduce the evidence, contending that it showed the context of and motivation for the shootings. Campos–Alvarez moved *in limine* to exclude the evidence, arguing it was unnecessary and unduly prejudicial because, under the prosecution's theory of the case, he had a motive to commit the shootings to avenge the killing of his friend Walter Villatoro regardless of his membership in Mara R. The judge rejected appellant's argument and permitted the prosecution to present the proffered gang evidence. The judge reasoned that the evidence would be helpful in making sense of the crime, "[p]articularly where there [was] no evidence that the victim ... was the person that shot the friend [Walter Villatoro]." Proof that the attack took place in the context of ongoing gang rivalry showed that it was "more than just revenge for the shooting of a friend."

■ The trial judge's decision to admit the gang evidence is subject to review for abuse of discretion.[3] Evidence is relevant, if it has "any tendency to make the existence of any fact that is of consequence more or less probable than it would be

---

**2.** In the grand jury, Morales testified that Kenny Loza had told him "he wasn't even sure who had shot him."

**3.** *Plummer v. United States,* 813 A.2d 182, 188 (D.C.2002).

without the evidence."[4] When gang evidence is relevant, the trial judge must "balance the probative value of the gang references against their potential for prejudice."[5] We recognize that a defendant may be prejudiced in the eyes of the jury by evidence of his gang involvement. This court has "cautioned trial judges to consider carefully before admitting evidence of gang retaliation, and then only after ensuring that the government's evidence is relevant, necessary and supported by competent evidence."[6] The "trial judge has the discretion to exclude [such] evidence if its probative value is substantially outweighed by the danger of unfair prejudice."[7] There is, however, no special admissibility rule for gang-related evidence: it is subject to the same balancing standard as applies to the admission of evidence generally.[8] Such balancing "is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision."[9]

■ We are satisfied that the trial judge did not exercise his discretion erroneously here. There was legitimate probative force to the evidence of Campos–Alvarez's membership in Mara R, the shooting victims' membership in Vatos Locos, and the violent rivalry between the two gangs; and the government had a substantial need for that evidence.[10] Without it, the government would have been left to argue, implausibly, that Campos–

Alvarez, an apparently ordinary member of the community, embarked on a vigilante shooting spree to avenge the killing of his friend Walter Villatoro—and not by targeting Villatoro's actual killer, but by indiscriminately attacking three persons who had nothing to do with the killing. Only when viewed in the context of an ongoing gang war did this picture of violent retaliation by Campos–Alvarez make sense. Because Villatoro was a friend associated with Campos–Alvarez's gang and was killed by a rival gang member at a time when the two gangs were feuding, it was understandable that Campos–Alvarez would seek revenge against any member of that rival gang. Campos–Alvarez's effort to recruit Roque Lopez, a member of Mara R, to participate in an attack on Vatos Locos members likewise made sense in light of their gang rivalry. Campos–Alvarez argues there was no evidence the leadership of Mara R directed him to carry out an attack on the enemy gang, but that is beside the point. A gang member can act on behalf of the gang, or for gang-related reasons, without following command and control protocol, and he can do so with more than a single purpose.

The trial judge reasonably could find that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We perceive "no significant danger that [Campos–Alvarez's] conviction rested merely on guilt by

4. *Foreman v. United States,* 792 A.2d 1043, 1049 (D.C.2002).

5. *Lazo v. United States,* 930 A.2d 183, 185 (D.C.2007).

6. *Plummer,* 813 A.2d at 189.

7. *Id.*

8. *See Lazo,* 930 A.2d at 185 (applying usual balancing test in case involving gang-related evidence).

9. *Mercer v. United States,* 724 A.2d 1176, 1185 (D.C.1999) (internal quotation marks and citation omitted).

10. Parenthetically, we note that Campos–Alvarez did not oppose the introduction of all this evidence. He deemed it sufficient for the court to admit the evidence of the victims' membership in Vatos Locos and the involvement of that gang in the killing of Villatoro.

association."[11]  Kenny Loza's and Javier Morales's eyewitness identifications, combined with Roque Lopez's testimony about Campos–Alvarez's incriminating statements, ensured that Campos–Alvarez's gang membership did not substitute for proof of his guilt.[12]  And while "[t]he admission of evidence whose sole purpose is to connect a defendant to a group of people of questionable character and [that is] not relevant to some other factual issue is improper,"[13] the evidence concerning Campos–Alvarez's gang activity was limited to what was directly probative of the charges against him.  There was no evidence, for example, of Campos–Alvarez's position in Mara R or his unrelated gang activities.  Nor did the government possess "alternative methods or evidence [to] prove the same proposition in a manner that [would have been] less unfairly prejudicial to the defendant."[14]  Any risk of unfair prejudice was further mitigated by the fact that the gang evidence supported the theory of Campos–Alvarez's defense at trial.  He argued to the jury that Kenny Loza, Noel Loza, and Javier Morales conspired among themselves to accuse him falsely of the shootings.  That argument was made far more plausible by his membership in a rival gang.

In short, the trial judge fairly found that the probative value of the evidence of Campos–Alvarez's membership in Mara R and of the violent conflict between Mara R and Vatos Locos was not substantially outweighed by the risk of unfair prejudice.  The judge did not abuse his discretion in admitting that evidence.

## B.  Certificates of No Record

■  To prove Campos–Alvarez guilty of the offenses of carrying a pistol without a license (CPWL) and possessing an unregistered firearm (UF), in violation of D.C.Code §§ 22–4504(a), 7–2502.01 (2001), respectively, the government offered in evidence two certificates signed by an employee of the Metropolitan Police Department.  The certificates stated that based on the employee's diligent search of the Department's records, Campos–Alvarez had neither a license to carry a pistol in the District of Columbia on August 5, 2002, nor a firearms registration certificate on that date.  Campos–Alvarez objected on Sixth Amendment grounds to the admission of the certificates without the testimony of the employee who performed the search.  His objection was overruled.

As Campos–Alvarez contends, and as the government concedes, it was constitutional error to admit the certificates of no record without live testimony from their preparer.  In *Tabaka v. District of Columbia*,[15] this court held that such certificates are testimonial for purposes of the Sixth Amendment's Confrontation Clause, and so are inadmissible unless the employee who performed the search and signed the certificate testifies at trial subject to cross-examination.[16]  We cannot say beyond a reasonable doubt that the unconstitutional admission of the certificates did not contribute to the jury's verdict of guilty on the CPWL and UF counts. We therefore must

11.  *Freeman v. United States,* 689 A.2d 575, 582 (D.C.1997).

12.  *Cf. United States v. Irvin,* 87 F.3d 860, 866 (7th Cir.1996) (finding that danger of unfair prejudice substantially outweighed probative value of evidence of gang affiliation in part because it served as a substitute for direct evidence of guilt).

13.  *Mercer,* 724 A.2d at 1185.

14.  *Id.*

15.  976 A.2d 173 (D.C.2009).

16.  *Id.* at 175–76.

reverse Campos–Alvarez's convictions for those two offenses.[17] (This will not necessitate any alteration of his overall sentence on remand, however, because the trial judge ordered the sentences on the CPWL and UF counts to run concurrently with Campos–Alvarez's other sentences.)

### C. Merger of Offenses

Campos–Alvarez was convicted of five counts of possession of a firearm during a crime of violence ("PFCV"). Each PFCV count corresponds to one of the five predicate armed offenses of which he was convicted: assault with intent to kill while armed ("AWIKWA"), aggravated assault while armed ("AAWA"), and three assaults with a dangerous weapon ("ADW"). Campos–Alvarez and the government agree that the PFCV convictions based on AWIKWA and AAWA merge (requiring one of them to be vacated) because they derive from the same violent act—the shooting of Kenny Loza; and that the PFCV conviction based on the ADW against James Bryant merges with one of the other PFCV convictions and should be vacated for the same reason, inasmuch as Bryant was a bystander and not a separate target of the attack. Campos–Alvarez further argues that the other two PFCV counts, which correspond to the ADW's on Noel Loza and Javier Morales, also merge

(with each other and with the PFCV associated with the assault on Kenny Loza), leaving him in the end with only a single PFCV conviction. The government disagrees. Our review of this merger issue is *de novo*.[18]

Where, as here, predicate armed offenses were committed against different victims and do not merge, the corresponding PFCV convictions ordinarily do not merge either.[19] Even so, applying the rule of lenity, we have held that merger is required if the PFCV convictions arise from "a single possession of a single weapon during a single violent act."[20] That holding has a constitutional underpinning: the Double Jeopardy Clause of the Fifth Amendment protects defendants against " 'multiple punishments for the same offense.' "[21] But the Fifth Amendment " 'does not prohibit separate and cumulative punishment for separate criminal acts.' "[22] We apply a " 'fact-based approach' in determining whether separate criminal acts have occurred" and merger therefore is inappropriate.[23] Criminal acts are considered distinct when (1) " 'there is an appreciable length of time between the acts,' " or when (2) " 'a subsequent criminal act was not the result of the original impulse, but a fresh one.' "[24] Acts may be separate even if the period of time between them is " 'quite brief,' "[25] as "one

---

17. See, e.g., Fields v. United States, 952 A.2d 859, 861, 864 (D.C.2008).

18. Jenkins v. United States, 980 A.2d 421, 424 (D.C.2009).

19. Stevenson v. United States, 760 A.2d 1034, 1035 (D.C.2000).

20. Id. at 1036 (quoting Nixon v. United States, 730 A.2d 145, 153 (D.C.1999)).

21. Jenkins, 980 A.2d at 424 (quoting Gardner v. United States, 698 A.2d 990, 1002 (D.C. 1997)).

22. Sanchez–Rengifo v. United States, 815 A.2d 351, 354 (D.C.2002) (quoting Owens v. United States, 497 A.2d 1086, 1094–95 (D.C.1985)).

23. Jenkins, 980 A.2d at 424 (quoting Morris v. United States, 622 A.2d 1116, 1130 (D.C. 1993)).

24. Id. (quoting Sanchez–Rengifo, 815 A.2d at 355).

25. Id. (quoting Cullen v. United States, 886 A.2d 870, 873 (D.C.2005)).

can experience and act upon a fresh impulse almost immediately."[26]

■ Applying those guidelines, we agree with the parties that the PFCV convictions based on the AWIKWA and AAWA on Kenny Loza merge.[27] We likewise agree that the PFCV conviction based on the ADW on James Bryant merges.[28] We conclude, however, that the remaining two PFCV convictions do not merge.

Campos–Alvarez accosted Kenny Loza outside the apartment building, drawing a weapon and firing at him first. Campos–Alvarez then turned his gun on the fleeing Noel Loza, who ran back to the building. He also fired at Javier Morales, who stood some distance away from his friends and initially took cover behind a parked car. "[A]t each stage of the assaults," Campos Alvarez "presumptively was able to desist from violence against another victim, but chose not to do so."[29] His "'successive intentions'" make "'him subject to cumulative punishment.'"[30]

Insofar as the PFCV convictions corresponding to the assaults on Noel Loza and Javier Morales are concerned, this case thus is distinguishable from *Nixon*, the paradigmatic case for appropriate merger of PFCV convictions on which Campos–Alvarez relies. Unlike in *Nixon*, where the appellant shot at a single target—an automobile with several occupants, resulting in convictions for three different types of assault and three corresponding PFCV convictions (which merged)[31]—Campos–Alvarez fired at three separate moving targets (Kenny Loza, Noel Loza, and Javier Morales), albeit rapidly and in quick succession. This case also is distinguishable from *West*, where the appellant had aimed at a single victim and unintentionally hit a bystander.[32] The evidence in this case shows Noel Loza and Javier Morales were not bystanders (as Bryant was); Campos–Alvarez intended to shoot at each of them separately.

In short, Campos–Alvarez reached a "fork in the road"[33] after shooting Kenny Loza. He could have elected not to fire at Noel Loza or Javier Lopez. "Instead, with a fresh impulse, he executed a new assault."[34] It follows that "despite the proximity of the crimes in time and place, they

---

**26.** *Ellison v. United States*, 919 A.2d 612, 617 (D.C.2007).

**27.** *See Nixon v. United States*, 730 A.2d 145, 153 (D.C.1999).

**28.** *See West v. United States*, 866 A.2d 74, 78, 84 (D.C.2005).

**29.** *Reeves v. United States*, 902 A.2d 88, 90 (D.C.2006) (finding no merger where evidence showed that appellant successively struck victims in the face with a gun while attempting to rob them and then shot the final victim as he tried to leave).

**30.** *Id.* (quoting *Spain v. United States*, 665 A.2d 658, 660 (D.C.1995)).

**31.** *Nixon*, 730 A.2d at 153.

**32.** *West*, 866 A.2d at 78.

**33.** *Wages v. United States*, 952 A.2d 952, 964 (D.C.2008). This court has looked to the "fork in the road" test to determine whether two separate criminal acts have occurred:

> If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then his successive intentions make him subject to cumulative punishment, and he must be treated as accepting that risk, whether he in fact knows of it or not.

*Jenkins v. United States*, 980 A.2d 421, 424 (D.C.2009) (quoting *Spain v. United States*, 665 A.2d 658, 660 (D.C.1995)).

**34.** *Wages*, 952 A.2d at 964. The appellant in *Wages* confronted two brothers at a restaurant, shooting one in the side and then, when the other brother stood up to help, shooting him in the side as well. *Id.* at 955. The court rejected appellant's merger argument.

constitute distinct violent crimes, and the PFCV convictions do not merge." [35] Three PFCV convictions, corresponding to the three assaults on Kenny Loza, Noel Loza, and Javier Morales, shall remain intact. [36]

## III. Marta Campos's Claims on Appeal

### A. Admission of Hearsay

At trial, the government sought to elicit from Kenny Loza what Miradis Viera–Miranda had told him about Marta Campos's offer to pay Loza not to come to court. Both Campos–Alvarez and Campos raised a hearsay objection. The judge admitted the testimony on the grounds that Viera–Miranda had been brought into a conspiracy with Campos–Alvarez and Campos and that her statement to Loza about the offer was made in furtherance of the conspiracy. The judge also overruled defense objections to Kenny Loza's testimony that he learned from Elizabeth Morales that, in return for money, Campos wanted him not to testify against her brother.

Campos argues that the trial court erred in admitting the foregoing testimony. Even if it did, however, Campos is not entitled to reversal, for we are satisfied that any error was harmless. [37] By the time Kenny Loza took the stand, Viera–

Miranda and Elizabeth Morales already had testified about Campos's stated purpose in reaching out to him. Viera–Miranda had explained that Campos wanted her to "offer" Loza "the money so he won't come to court." Morales similarly had stated that Campos "wanted to speak to Loza to offer him money to not show up to court." Loza's challenged testimony was, therefore, cumulative. Because he based it on what he learned from Viera–Miranda and Morales and did not add anything new, the testimony could not have substantially swayed the verdict. [38]

### B. Sufficiency of the Evidence of Obstruction and Conspiracy

Marta Campos next challenges the sufficiency of the evidence supporting her convictions for obstruction of justice and conspiracy to obstruct justice. We assess the evidence " 'in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact. . . .' " [39] We make no distinction between direct and circumstantial evidence. [40] And the government's evidence need not negate every possible inference of innocence to support a guilty verdict. [41] "Only when there is 'no

---

**35.** *Id.* at 964.

**36.** Because Campos–Alvarez received concurrent sentences on the PFCV counts, the vacatur on remand of two of his convictions on those counts will not affect his sentence.

**37.** *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

**38.** *See Reyes v. United States*, 933 A.2d 785, 793 n. 10 (D.C.2007) (stating that even if trial court erred in admitting officer's testimony under the spontaneous utterance exception, it was harmless because it was mostly cumulative of other testimony); *Carter v. United*

*States*, 614 A.2d 542, 545 (D.C.1992) (finding erroneously admitted hearsay used to impeach appellant's testimony harmless because it was only cumulative given impeachment through properly admitted evidence and because other evidence showed appellant's guilt).

**39.** *Moore v. United States*, 927 A.2d 1040, 1049 (D.C.2007) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987)).

**40.** *Earle v. United States*, 612 A.2d 1258, 1265 (D.C.1992).

**41.** *E.g., Smith v. United States*, 899 A.2d 119, 121 (D.C.2006).

evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt' may we reverse a conviction for evidentiary insufficiency." [42]

■ In pertinent part, D.C.Code § 22–722(a) (2001) provides that a person commits obstruction of justice if he or she:

(2) Knowingly uses intimidating or physical force, threatens or corruptly persuades another person, or by threatening letter or communication, endeavors to influence, intimidate, or impede a witness or officer in any official proceeding, with intent to:

(A) Influence, delay, or prevent the truthful testimony of the person in an official proceeding. . . .

In order to prove criminal conspiracy, the government must show: "1) an agreement between two or more people to commit a criminal offense; 2) knowing and voluntary participation in the agreement by the defendant with the intent to commit a criminal objective; and 3) commission in furtherance of the conspiracy of at least one overt act by a co-conspirator during the conspiracy." [43]

■ Campos's sole contention is that the evidence was insufficient to prove that she possessed the requisite intent for obstruction or conspiracy to obstruct justice. The government, she asserts, failed to present evidence allowing a jury to find beyond a reasonable doubt that she intended to prevent *truthful* testimony by Kenny Loza. According to Campos, what evidence of obstruction there was required the jury to make unreasonable inferential leaps,

as—she claims, though she did not testify at trial—she believed in her brother's innocence and Melvin Morales testified that she only meant to dissuade Loza from testifying falsely against him.

■ Campos's argument is not persuasive. The intent required for obstruction of justice often "must be inferred from the context and nature of the alleged criminal conduct." [44] And "[a] conspiratorial agreement may be inferred from circumstances that 'include the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties and the interests of the alleged conspirators.' " [45] In this case, there was evidence that Campos–Alvarez formulated a plan to bribe Kenny Loza not to identify him at trial as one of his assailants. To effectuate that plan, Campos–Alvarez needed help, as he himself was incarcerated. The evidence shows that he turned first to his former girlfriend, Viera–Miranda, and then to his sister, Marta Campos—persons whom he believed he could trust. Campos actively joined with her brother in urging Viera–Miranda to contact Loza and bribe him "so he won't come to court." Campos also approached Melvin Morales for help in locating Loza so that she could offer the bribe herself. From this evidence, the jury reasonably could infer that Campos conspired with her brother to pay Loza not to appear at trial or testify against him, regardless of the truth or falsity of his anticipated testimony. The jury was not obliged to credit Morales's account that

**42.** *Moore*, 927 A.2d at 1049 (quoting *Frendak v. United States*, 408 A.2d 364, 371 (D.C. 1979)).

**43.** *McCullough v. United States*, 827 A.2d 48, 58 (D.C.2003) (citing *Gibson v. United States*, 700 A.2d 776, 779 (D.C.1997)). *See also* D.C.Code § 22–1805a (2001 & Supp.2010).

**44.** *McBride v. United States*, 393 A.2d 123, 131 (D.C.1978).

**45.** *Castillo–Campos v. United States*, 987 A.2d 476, 483 (D.C.2010) (quoting *Ramirez v. Almager*, 619 F.Supp.2d 881, 901 (C.D.Cal. 2008)).

Campos sincerely wanted Loza to "go to court and do what he got to do" if he was certain that her brother shot him. (Nor was the jury obliged to believe Viera–Miranda's claim that she believed the money was being offered to forestall the conviction of an innocent man.) Thus, we are satisfied there was evidence for the jury to find Campos guilty of obstruction of justice and conspiracy to obstruct justice beyond a reasonable doubt.

## IV.   Conclusion

For the foregoing reasons, we affirm Elmer Campos–Alvarez's convictions, except for his CPWL and UF convictions, which we reverse. We also affirm Marta Campos's convictions. We remand for the trial court to vacate three of Campos–Alvarez's PFCV convictions on merger grounds.

*So Ordered.*