*Notice:  This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-CF-1503 and 11-CF-1507

DARIUS BROWN and JAMAL SHEPHERD, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-10578-11 and CF3-15407-10)

(Hon. Ronna Lee Beck, Trial Judge)

(Argued December 5, 2013                    Decided April 17, 2014)

*Debra L. Soltis*, with whom *Paul Y. Kiyonaga* was on the brief, for appellant Darius Brown.

*Richard S. Stolker* for appellant Jamal Shepherd.

*John P. Gidez*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *Ephraim Wernick*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and BELSON, *Senior Judge*.

FISHER, *Associate Judge*:  Following a jury trial, appellants Jamal Shepherd

and Darius Brown were convicted of several offenses related to a shooting and the

subsequent police investigation. Shepherd now challenges the sufficiency of the evidence supporting his convictions for obstruction of justice and carrying a pistol without a license ("CPWL").[1] Brown challenges the sufficiency of the evidence supporting all four of his convictions: perjury, conspiracy to obstruct justice, and two counts of obstruction of justice. Rejecting these claims and various others that appellants raise, we affirm.

## I. Factual Background

During the afternoon of February 9, 2010, Jamal Brooks got into a heated argument with his neighbor, Raymond Washington. Later that evening, Brooks brought three of his friends (including both appellants) to the house where Washington was staying. Brooks, who was carrying a revolver in his back pocket, then resumed his argument with Washington. Brooks's three friends joined the bickering and, after about fifteen minutes, appellant Shepherd suddenly grabbed Brooks's gun and shot Washington in the head and arm. Although Washington survived, the bullet to his head destroyed his right eye.

---

[1] In addition to these two convictions, Shepherd was found guilty of assault with intent to kill while armed, mayhem while armed, assault with a dangerous weapon, three counts of possession of a firearm during the commission of a violent crime, unlawful possession of a firearm, and conspiracy to obstruct justice.

In the investigation that followed, the police had considerable difficulty identifying the shooter. They initially arrested Brooks, who admitted that he and appellant Brown had witnessed the shooting. Brooks made it clear that someone else had been the shooter, but he denied knowing who the shooter was. Consequently, detectives turned the focus of their investigation to Brown.

Detectives interviewed Brown for the first time on April 14, 2010. At that time, according to evidence presented at trial, Brown knew that Brooks had been arrested and was being held in jail.[2] Brown gave detectives a detailed physical description of the shooter, but he denied (as Brooks had) knowing the shooter's name. Brown told detectives he had only seen the shooter on two occasions prior to the night of the shooting.

The next day, Brown testified before a grand jury that was investigating the shooting. As part of his testimony, Brown provided his account of the shooting and again gave a detailed physical description of the shooter. The prosecutor

---

[2] Brooks testified that "a month and [a] half or two months" after the February 9th shooting, he called Brown from jail and told him "I'm locked up." The government initially charged Brooks with assault with intent to kill. After dropping that charge on March 3, 2010, the government charged Brooks with unlawful possession of a firearm by a felon.

asked Brown if he had ever seen the shooter before, and Brown responded, "Only on, like, two other occasions before that." The prosecutor followed up by asking, "Did you know his name?" Brown answered, "No. I only—like, [Brooks] introduced me to him but, like, introduced me by nickname, and I don't really recall it." The prosecutor then asked, "So you don't know what his name is, or any nickname?" Brown replied, "I think [Brooks] was calling him, like, Moe."

By the end of Brown's grand jury testimony, detectives still did not know the identity of the shooter. However, Brooks eventually cooperated with investigators and identified his longtime friend Shepherd as the shooter. Detectives also learned that Brown had lied about not knowing Shepherd and that the two men had conspired in an attempt to prevent Brooks from cooperating with authorities. As a result, Brown and Shepherd were both indicted for their respective roles in the shooting and the attempted cover-up. The men were tried together in August 2011, and these appeals followed.

## II. Analysis

We first consider appellants' claims of insufficient evidence, reviewing the record "in the light most favorable to the government." *Campos-Alvarez v. United*

*States*, 16 A.3d 954, 964 (D.C. 2011) (quoting *Moore v. United States*, 927 A.2d 1040, 1049 (D.C. 2007)). We then address appellants' various other arguments.

## A. Brown's Perjury and Obstruction of Justice

Brown first challenges his conviction for perjury, which was based on statements he made to the grand jury while under oath. *See* D.C. Code § 22-2402 (2009 Supp.). He correctly points out that the sworn statements at issue could be understood to mean that he did not know Shepherd's name—and had only seen Shepherd on two prior occasions—as of the night of the shooting (rather than as of the day of the grand jury testimony). Hence, Brown primarily contends that the government failed to prove that his testimony was literally false. He relatedly asserts that the evidence of falsity was insufficient under "the special 'two-witness' rule applicable to perjury prosecutions." *Gaffney v. United States*, 980 A.2d 1190, 1192 (D.C. 2009). We disagree. Even if we view the record of his grand jury testimony in the light Brown suggests, there was sufficient evidence to support his perjury conviction.[3]

---

[3] Brown's brief suggests, in passing, that the government failed to demonstrate how his testimony regarding the identity of the shooter was material. The brief acknowledges, however, that "[t]he 'point of inquiry' during

(continued…)

At trial, the government introduced a recorded phone call in which Brown actually admitted to a friend that he had committed perjury and obstructed justice by lying to the police and to the grand jury.[4]  Such an admission is not sufficient by itself to sustain a perjury conviction, but it does powerfully corroborate the government's independent evidence.  *Id.* at 1196.  Moreover, the "'two-witness' label is really a misnomer," as the rule may be satisfied with circumstantial evidence.  *Murphy v. United States*, 670 A.2d 1361, 1365 (D.C. 1996); *Boney v. United States*, 396 A.2d 984, 986 n.2 (D.C. 1979).  Rather than dictating how the government must prove its case, the "two-witness" rule essentially requires corroboration—an "evidentiary minimum" of proof.  *Gaffney*, 980 A.2d at 1194.

---

(…continued)
Mr. Brown's grand jury testimony was who shot Mr. Washington."  There is no serious question, then, that Brown's disclaimer of knowledge on that very point was indeed material.  We note that the government no longer relies on a second theory of perjury presented at trial, which was based on Brown's grand jury testimony that someone other than Brooks or Shepherd had brandished the gun on the night of the shooting.

[4]  Brown made this admission only five days after being arraigned, and the indictment specifically set forth the particular grand jury statements underlying the perjury charge.

In this case, the lead detective testified about phone records that indicated Brown and Shepherd had likely spoken on the phone close to 1,500 times in the fifteen months after the shooting. Such a high volume of calls suggests that the two individuals knew each other before the shooting. The detective also testified about specific phone conversations between Brown and Shepherd that were recorded while Shepherd was in jail. These calls also took place after the shooting, but the substance, manner, and context of the conversations circumstantially demonstrate a strong and longstanding familiarity between Brown and Shepherd.[5] In one of the calls, Brown explicitly says, referring to Shepherd: "I know this nigga'. I deal with this nigga'."

Separately, Brooks testified that at the time of the shooting, he had known Shepherd for about ten years and considered him a friend. Other evidence showed that Shepherd and Brooks saw each other regularly.[6] Brooks further testified that Brown had been "like family" to him for his "whole life." Taken as a whole, this

---

[5] For example, in his first phone call after being arrested, Shepherd immediately asks his mother to set up a three-way call with Brown. Shepherd and even his mother both refer to Brown and Brown's girlfriend by their nicknames. Throughout the calls, Brown and Shepherd repeatedly express their shared frustration and anger with Brooks for cooperating with detectives.

[6] During a recorded phone call, Brown said that Brooks had been "hangin' with [Shepherd] every day."

evidence naturally supports an inference that Brown at least knew who Shepherd was on the night of the shooting.

It is possible, strictly speaking, that the friendship between Brown and Shepherd formed *after* the shooting, that a flurry of 1,500 phone calls immediately ensued, and that Brown had previously managed to be "like family" to Brooks without ever learning Shepherd's name or seeing him more than twice in ten years. However, the government's evidence need not "negate every possible inference of innocence." *Campos-Alvarez*, 16 A.3d at 964. Here, the abundant circumstantial evidence (much of it consisting of phone records or recorded calls from the jail) and Brown's recorded admission satisfied the "evidentiary minimum" required by our perjury cases. *See Smith v. United States*, 68 A.3d 729, 741-42 (D.C. 2013) (perjury conviction upheld based mainly on circumstantial evidence, including phone records and recorded jail call).

Brown's untruthful statements to the grand jury also supported one of his convictions for obstruction of justice under D.C. Code § 22-722 (a)(6) (2009 Supp.). Having already identified sufficient evidence in the record to show that Brown lied under oath, we reject Brown's argument that the government failed to prove he acted "corruptly" during his grand jury testimony. Likewise, we reject

his argument that the government failed to prove he possessed the requisite specific intent to obstruct justice in an official proceeding. Evidence of such intent certainly may be circumstantial. *See Crutchfield v. United States*, 779 A.2d 307, 325-27 (D.C. 2001) (concluding that a defendant acted with specific intent to obstruct justice by murdering a witness who knew facts that incriminated the defendant). Here, the government introduced a recorded phone call in which Brown not only admitted that he had lied to detectives and the grand jury, but also plainly acknowledged that obstruction of justice was a "clear case" that "I'm guilty of real live." These statements clearly support an inference that Brown intentionally lied under oath and thereby acted with the specific intent to obstruct justice.

Brown's other obstruction of justice conviction under § 22-722 (a)(6) was based on certain statements he made in a taped interview with detectives on April 14, 2010. These statements were the same, materially, as the ones he made to the grand jury about not knowing Shepherd on the night of the shooting, and we have already explained that the government presented sufficient evidence to prove that those statements were untruthful. Moreover, as we have noted, Brown's subsequent confession on a recorded call manifests his specific intent to obstruct

justice by lying to detectives. "I actually lied to the police officers . . . the first time they questioned me," he said.

Brown contends, however, that his untruthful statements to detectives cannot constitute obstruction of justice because they were not made "in any official proceeding." D.C. Code § 22-722 (a)(6) (2009 Supp.). This claim fails, since an untruthful statement can "obstruct or impede the due administration of justice in [an] official proceeding" even when the statement is not made *during* that official proceeding. *Id.* Evidence at trial showed that when detectives first interviewed Brown, he knew that Brooks had already been arrested in connection with the shooting. And, in *Wynn v. United States*, we noted that "a pending criminal prosecution . . . [is] unquestionably covered by the definition of an 'official proceeding.'" 48 A.3d 181, 187 (D.C. 2012). Thus, Brown knew that lying to detectives could "obstruct or impede the due administration of justice in [an] official proceeding"—namely, a pending criminal prosecution that involved details about the shooting. D.C. Code § 22-722 (a)(6) (2009 Supp.).

In sum, the government presented sufficient evidence to sustain Brown's conviction for perjury as well as both of his convictions for obstruction of justice.

## B. Conspiracy to Obstruct Justice

Next, Brown challenges the sufficiency of the evidence supporting his conviction for conspiracy to obstruct justice under D.C. Code §§ 22-1805a and -722 (a) (2009 Supp.). The conspiracy, as shown by evidence at trial, was a joint effort by Shepherd and Brown to prevent Brooks from testifying truthfully about Shepherd's role in the shooting. Brown claims that the government failed to prove that he ever had the specific intent to exert this type of influence on Brooks. Again, we disagree.

In a recorded phone call that the government entered into evidence, Brown expressed frustration that Brooks "went in there and told the truth" to the police. Later, in another recorded call presented to the jury, Brown told Shepherd that he (Brown) had recently confronted Brooks over the phone about being "the motherfuckin' witness in that situation." When Shepherd said that Brown should go see Brooks in person, Brown replied, "What you want me to holler at him about? Tell his ass to do the right thing? I was tellin' his ass that on the phone!"

At the end of the call, Shepherd said, "We got to get at Slim, man," which was a reference to Brooks. Brown responded, "Yeah."[7]

This evidence is sufficient to sustain Brown's conviction for conspiracy to obstruct justice. The phone calls noted above underscore Brown's strong disapproval of Brooks telling the truth to the police. Further, the calls attest to an understanding between Shepherd and Brown that they needed to do something to stop Brooks's continued cooperation with authorities. Thus, Brown demonstrated his specific intent to obstruct justice when he plainly stated that he had told Brooks to "do the right thing."[8] Unfortunately, Brown's conception of "the right thing" was in direct violation of the law.

## C. Shepherd's Obstruction of Justice and CPWL

---

[7] Brooks also testified that while he was in jail, Brown told him on two occasions that Shepherd wanted him (Brooks) to deny knowing Shepherd.

[8] Brown also argues that the government "affirmatively relied" on his physical description of the shooter during closing argument. According to Brown, such reliance "is, at its core, at odds with the government's burden to establish that Mr. Brown possessed the specific intent to conspire to obstruct justice." This argument fails regardless of whether the government actually "relied" on Brown's physical description of the shooter. It simply does not follow that Brown's honesty in one matter (the shooter's physical description) precludes the possibility that he intended to deceive detectives in another matter (the shooter's actual identity).

Shepherd's obstruction of justice conviction under § 22-722 (a)(6) was based on a phone call in which he told Brooks "to keep the code." At trial, Brooks testified that he understood this instruction as a reference to the "[c]ode of not snitching." Importantly, at the time of the phone conversation, Shepherd knew that Brooks was in jail awaiting prosecution on charges related to the shooting. Accordingly, the evidence established that Brown had endeavored "to obstruct or impede the due administration of justice in [an] official proceeding." D.C. Code § 22-722 (a)(6) (2009 Supp.).

Shepherd nevertheless argues that his instruction "to keep the code" was not given "corruptly, or by threats of force," and therefore cannot fit within the scope of § 22-722 (a)(6). He contends that encouraging someone to merely withhold information is not "corrupt," nor is appealing to someone's "long term friendship" when providing such encouragement. This claim mischaracterizes the record and misconstrues the law.

As to the record, Brooks testified that his initial hesitation to implicate Shepherd in the shooting stemmed from an awareness that "snitches get stitches." When asked what that meant, Brooks explained that "if you snitch on someone you could die" or "get hurt." And, as noted, Brooks understood Shepherd's instruction

"to keep the code" as a reference to the "[c]ode of not snitching." This belies Shepherd's suggestion that his instruction to Brooks drew only "on the parties' long term friendship, not [on] force or threat of force."

However, even assuming—for the sake of argument—that Shepherd issued no implicit threat and merely "encouraged his friend to remain silent," such encouragement would still have violated § 22-722 (a)(6). Under that subsection, an individual can obstruct justice in two separate ways—either "[c]orruptly, or by threats of force." Individuals who act "corruptly" may therefore be guilty of the offense even if they make no threats whatsoever. Applying a federal statute that prohibits obstruction of justice, the Supreme Court analyzed the term "corruptly," distilling its connotations into the word "wrongdoing." *Arthur Anderson LLP v. United States*, 544 U.S. 696, 705-06 (2005). Lower courts construing the same statute have likewise explained that individuals act "corruptly" when they are "motivated by an improper purpose." *United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cir. 1998); *see also United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).

This court has already given the term "corruptly" a similar construction. In *Riley v. United States*, we held that it "is obstruction of justice . . . to induce or

attempt to induce a witness to absent himself . . . and therefore not to give any testimony at all." 647 A.2d 1165, 1173 (D.C. 1994) (opinion of Ferren, J.). *Riley* involved a suspect whose girlfriend had been subpoenaed to testify before a grand jury about a shooting, and she knew information that would incriminate him. *Id.* at 1168-69 (opinion of King, J.). Although the suspect did not threaten his girlfriend, he instructed her to not tell the grand jury anything. *Id.* We held that the suspect gave this instruction "[c]orruptly" and thereby obstructed justice under § 22-722. *Id.* at 1173 (opinion of Ferren, J.).[9] This precedent squarely forecloses Shepherd's claim that non-threatening requests for silence fall outside the scope of § 22-722.

Shepherd also challenges the sufficiency of the evidence supporting his CPWL conviction under D.C. Code § 22-4504 (a) (2009 Supp.). The statute provides that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license." Shepherd concedes that the evidence at trial established that he grabbed a pistol from Brooks, "immediately fired it twice, and then left the premises." Shepherd also acknowledges that he did not have a license for the pistol. Indeed, Shepherd's only argument with respect to CPWL is that the government failed to prove that he

---

[9] On this issue, Judge Ferren wrote for the majority of the court. In a separate opinion, Judge King reached the same result with respect to the suspect's obstruction of justice. *Id*. at 1169 n.11.

actually *carried* the gun anywhere before or after firing it. However, this court has previously read the term "carry" under § 22-4504 to include "actual possession of the gun." *White v. United States*, 714 A.2d 115, 118-19 (D.C. 1998). "[A]ctual possession" is defined as "direct physical control over an object at a given moment." *Id.* at 118 n.6. Here, there is no question that Shepherd had "direct physical control" over the gun at the moment he fired it, which means that the government presented sufficient evidence to sustain his CPWL conviction.

### D. Other Claims

Shepherd appeals the trial court's denial of his motion to suppress two identifications that witnesses made from a nine-person photo array. Detectives showed this array to a woman who had witnessed the shooting but did not know Shepherd personally, and she immediately identified Shepherd as the shooter. Detectives also showed the array to Brooks, who likewise identified Shepherd correctly. Shepherd argues the array was "unduly suggestive" because of "significant variances in skin shading, hairlines and overall appearance" among the men pictured. He further argues that the length and style of his facial hair is "significantly different" from that of several others in the array. Shepherd also

takes issue with the fact that although the other eight men in the array were each thirty-two years old at the time their photos were taken, he was only twenty-six.

The trial court considered and rejected all of these arguments, concluding that the photo array was not unduly suggestive. The array is in the record before us, and—having reviewed it—we see no reason to disturb the trial court's determination, which is "supported by the evidence and in accordance with the law." *Jones v. United States*, 879 A.2d 970, 975 (D.C. 2005) (quoting *Black v. United States*, 755 A.2d 1005, 1008 (D.C. 2000)).[10] Shepherd's argument is particularly weak with respect to the identification made by Brooks, since Brooks had known Shepherd for about ten years at the time of the shooting.

Shepherd also appeals the trial court's denial of his motion to exclude two graphic photographs taken of Washington at the hospital after the shooting. Although Shepherd has not made these photos part of the record on appeal, he

---

[10] "Because we [hold] that the array was not [unduly] suggestive, we do not" address Shepherd's arguments regarding "the reliability of the identification." *Buergas v. United States*, 686 A.2d 556, 559 (D.C. 1996) (per curiam). Likewise, we do not address Shepherd's claim regarding the suggestive nature of in-court identifications, an issue he raised for the first time at oral argument. *See District of Columbia v. Patterson*, 667 A.2d 1338, 1346 n.18 (D.C. 1995) (quoting *Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir. 1990)) ("All arguments for reversal must appear in the opening brief, so that the appellee may address them.").

argues they "were far more prejudicial than relevant" and were admitted for the "sole purpose" of inflaming "the jury's passions." However, the severity of Washington's injury was directly relevant to the charges of mayhem while armed and assault with intent to kill while armed.[11] "Reversal is warranted only upon a showing of an abuse of [the trial court's] discretion," and here, the photographs at issue were "corroborative of other evidence" proving the severity of Washington's injury. *Pittman v. United States*, 375 A.2d 16, 19 (D.C. 1977). On this point, the government was not "required to sanitize [its] evidence." *Dixon v. United States*, 565 A.2d 72, 76 (D.C. 1989). The trial court did not abuse its discretion in admitting the photos.[12]

---

[11] *See, e.g.*, *Edwards v. United States*, 583 A.2d 661, 668 (D.C. 1990) (noting an element of mayhem is "that the defendant caused permanent disabling injury to another"); *Castillo-Campos v. United States*, 987 A.2d 476, 487 (D.C. 2010) (stating that a conviction for assault with intent to kill while armed may be sustained, in part, on evidence "that the accused targeted the weapon at a particularly vulnerable area of the [victim's] body").

[12] This case is analogous to *Riley v. United States*, where a victim had lost one of his eyes in a shooting. 647 A.2d at 1168, 1172 (opinion of King, J.). One of the defendants in *Riley* claimed that the trial court erred in allowing the victim "to remove his eye patch and show his eye socket to the jury." *Id.* at 1172. The court rejected this claim, noting that the government had been "required to prove 'permanent disabling injury' for a mayhem charge. . . . Being satisfied the trial court properly weighed probativeness [of the evidence] versus prejudice," this court concluded "there was no abuse of discretion in allowing the victim to display his wound to the jury." *Id.* at 1172-73.

Finally, Brown claims it was plain error for the trial judge to not correct, *sua sponte*, a misstatement the prosecutor made during the rebuttal segment of his closing argument. The prosecutor inaccurately argued that "there were thousands of hours of phone calls" between Shepherd and Brown. Acknowledging that the jurors had not heard all of the recorded phone calls available, the prosecutor stated: "You're hearing some of them. That's true. But all of us [apparently referring to all counsel] heard them. In these . . . stipulations, you'll see, they said they were jointly approved. Okay? There's no reason to believe there's anything exonerating in [the other calls]."

Given the evidence that there had been approximately 1,500 calls between Shepherd and Brown, the prosecutor perhaps confused the number of relevant calls with the number of hours spent on those calls. In any event, because defense counsel did not object to the prosecutor's remarks, we may only reverse for plain error. *See United States v. Young*, 470 U.S. 1, 16 (1985) (when reviewed under plain error standard, inappropriate statements by prosecutor "were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"). No plain error occurred here, as the government's evidence against Brown was overwhelming.

## III. Conclusion

The judgments of the Superior Court are hereby

*Affirmed.*