## PYLE v. UNITED STATES.
### No. 9155.

United States Court of Appeals
District of Columbia.

Argued May 20, 1946.

Decided June 28, 1946.

Mr. James J. Laughlin, of Washington, D.C., for appellant.

Mr. Sidney S. Sachs, Assistant United States Attorney, of Washington, D.C., with whom Mr. Edward M. Curran, of Washington, D.C., United States Attorney, was on the brief, for appellee.

Before GRONER, Chief Justice, and WILBUR K. MILLER and PRETTYMAN, Associate Justices.

WILBUR K. MILLER, Associate Justice.

During a two weeks' visit in Washington in December, 1943, Mary J. Pyle, of Lufkin, Texas, met and became immorally intimate with Chalmers H. Laubaugh, the operator of a pool room. After she returned to Texas, Laubaugh visited her there and asked her to return to Washington with him and marry him. She accompanied him to Washington early in 1944 and, in an apartment provided by him, lived with him as his wife but without going through a marriage ceremony. Except for a few weeks in Texas during the late spring, this arrangement continued until Mary left Washington on September 2, 1944, to return to her parents' home.

During all this time, Chalmers, or "Buck," Laubaugh also was intimate with Shirley Shelton, known in the record often as "Skippy." It appears that at least some of the money which Buck Laubaugh spent in maintaining Mary Pyle was given to him by Shirley from her earnings as a prostitute. It also appears that there was a coolness between Mary Pyle and Shirley

Shelton. Sometime in the summer of 1944 Shirley went to Anderson, Indiana. In August she wrote to Buck Laubaugh that she was without funds and desired money from him so that she might return to Washington. Laubaugh and one Sipe went to Indiana and brought Shirley back to the District on August 29, 1944. Displeased at her return, Mary Pyle left for Texas on September 2, 1944.

On September 18, 1944, two agents of the Federal Bureau of Investigation called at her farm home to obtain a statement from her concerning the activities of Laubaugh. Apparently the F.B.I. was then assembling evidence which resulted in the indictment of Laubaugh in October, 1944, on a charge of unlawfully transporting Shirley Shelton from Indiana to Washington for immoral purposes on August 29, 1944. During an interview of four hours or more, the agents reduced to writing the story which they say the appellant told them on that occasion concerning her visits to and life in Washington and concerning Laubaugh's relations with Shirley Shelton. The statement included the following:

"She (Skippy) left him a note and said she needed a rest and would be back in about three weeks or perhaps not at all. Buck did not seem disturbed about this at first but he found out that she had gone off with a man I knew as Paul who worked at the Parkside Grill. He, Buck, said he contacted her mother and that she had told her mother she was going to get married. Buck said he was going to locate her and that if she was going to get married he wasn't going to do anything about it but that if she wasn't going to get married he was going to bring her back because he didn't intend to let her work for anyone else but himself.

"Buck and Nelson Sipes went to Anderson, Indiana, where they heard she was with Paul and brought her back. They rode the train over and back and brought her on the train. Paul came back on the same train but not with Buck and Nelson and Skippy. This was about the last of August 1944."

Laubaugh was tried and convicted in April, 1945, for unlawfully transporting Shirley Shelton. Mary Pyle testified as a witness for the government. She said she had known that Laubaugh and Shirley Shelton had lived together for three and one-half years somewhere on 10th Street and that Laubaugh informed her Shirley had gone to Indiana; that later he showed her a letter in which Shirley said she desired to return to Washington but had no money. A portion of Mary's evidence on direct examination is as follows:

"Q. Now, Miss Pyle, do you recall when Buck left for Indiana? Do you recall that? A. Yes.

"Q. Do you remember who was with him? A. Well, Mr. Sipe went with him.

"Q. Do you recall when they returned? A. Yes, I know when they came back. I do not know the exact date, but I think it was on Thursday morning, some time, I think, or on Wednesday night, I am not sure.

"Q. That was around the latter part of August or the first part of September, was it? A. Yes.

"Q. How long after they came back with Skippy was it that you left Washington and returned to your home in Texas, how many days went by? A. It was only two or three days.

"Q. Did you intend to remain permanently in Texas, at that time? A. Well, I was very mad and angry that she came back.

"Q. You were mad and angry that she came back? A. Yes.

"Q. Did you attempt to stop Buck from going after her? A. I told him he should not, and he said she was out there and broke and needed money, and so he was taking it to her.

"Q. Did you suggest to Buck that he could send a money order, or a telegram forwarding the money to her, and that it was not necessary for him to carry it out there in person? A. No. I did not."

Mary Pyle's written statement of September 18, 1944, was introduced in evidence in the prosecution of Laubaugh and, when Mary was interrogated concerning it, she testified that she signed the statement because the agents told her she would get two

years if she did not and that they would tell her mother of the life she lived in Washington. In spite of her claim that the statement was given involuntarily, she did not repudiate it as she testified against Laubaugh. On the contrary, she said that one of the agents read the statement to her and that it was an accurate record of what she had said to them. This is shown by the following excerpt from her testimony:

"Q. And do you recall whether or not the agents read back to you, when they read the statement to you, actually what you told them? In other words, was it correct in that statement?

"By the Court:

"Q. What is the answer? A. What they read back to me was what I told them.

"By Mr. Margolius:

"Q. Now, would you say that what you just answer—just told his Honor that, was actually what you told them,—would you say that applied to the entire nine pages? A. What they read to me was exactly what I told them.

"Q. Then why did you refuse to sign the statement? A. I didn't refuse to sign it."

In some particulars, however, she denied having made certain statements contained in the writing signed on September 18, 1944. For example, she said she paid the rent on the Washington apartment when the writing said that Laubaugh paid it. She testified that she did not know that Laubaugh obtained from Shirley Shelton money derived from her prostitution, although the written statement was to the effect that she did know it. She denied having mentioned an address on 8th Street, although the writing said that, at the instance of Laubaugh, she had visited an abortionist at that address. She denied having said that Laubaugh wrote to her in Texas, saying he would give up Shirley Shelton if she would return. In other minor matters, her evidence at Laubaugh's trial differed from statements contained in the writing signed by her.

Because of her testimony at the trial of Laubaugh in April, Mary J. Pyle was in-dicted for perjury in July. She was charged with having testified falsely in saying the statement given to the agents by her on September 18, 1944, was signed involuntarily. This, the indictment alleged, was a matter material to the subject of inquiry in the trial of Laubaugh. The appellant was convicted of perjury and by this appeal seeks a reversal of the judgment entered against her pursuant to the jury's verdict.

Errors assigned are that the justice who presided at the Laubaugh trial was not qualified to act, and that a teletype message which was received in evidence was improperly admitted, as it charged the appellant with criminal offenses other than that for which she was on trial.

■ With respect to the first error assigned, it is argued that the Honorable Henry A. Schweinhaut, an associate justice of the United States District Court for the District of Columbia, who presided at Laubaugh's trial at which Mary J. Pyle is said to have sworn falsely, was disqualified because his residence was in Maryland, just outside the District of Columbia. This contention is made because Title 28 U.S. C.A. § 1, provides that: "* * * Every district judge shall reside in the district * * * for which he is appointed, and for offending against this provision shall be deemed guilty of a high misdemeanor." For the same reason, the qualification of the late Chief Justice Eicher of the District Court of the United States for the District of Columbia was once challenged, and the matter was heard by a specially designated district judge. The decision in that case[1] so clearly, completely and correctly disposes of the present contention that we adopt as our own the pertinent portion of the opinion. Reference is made to that opinion, therefore, for a statement of the reasons which lead us to conclude that the statute which requires a district judge to reside in the district for which he is appointed is not applicable to the justices of the District Court of the United States for the District of Columbia.

The teletype message, complained of in the second assignment of error, was sent by the Federal Bureau of Investigation in

---

[1] U. S. ex rel. Laughlin v. Eicher, D. C., 56 F.Supp. 972.

Washington to its Texas agents. It instructed them to obtain a statement from Mary Pyle, which, as has been shown, they proceeded to do on September 18, 1944. The text of the message is shown in the margin.[2]

The government argues that the teletype was properly admitted because it established that the agents, at the time they called upon the appellant and obtained her statement had only the information contained therein. It is said that by contrasting this meagre information with the detailed narrative in the written statement which was obtained, it was shown that the appellant had voluntarily given information to the agents. Such reasoning does not appear to us to be sound. In that way, it may be deduced only that the agents obtained from Mary Pyle practically all the information in the statement; but by no means does it follow that she gave it voluntarily.

■ Without deciding that the teletype message was otherwise admissible, we hold that it was error to receive it because it accused the appellant of having been guilty of fornication with Laubaugh in Washington, which is a criminal offense in the District of Columbia.[3]

In O'Brien v. United States,[4] this court said:

"We have said in a number of cases that distinct and different crimes independent of that charged may not be used to establish guilt. Borum v. United States, 61 App.D.C. 4, 6, 56 F.2d 301. And we have also said that, when such evidence is admitted and shown in the record, we will presume it to be injurious. Parlton v. United States, 64 App.D.C. 169, 173, 75 F.2d 772." The word "crime," as commonly understood in this jurisdiction, includes both felonies and misdemeanors.[5] To receive evidence in a criminal trial to the effect that the defendant has committed a misdemeanor wholly foreign to the charge then under inquiry is equally as erroneous as to admit evidence of the commission of an unrelated felony.

The appellant did not formally assign as error the lower court's ruling that her alleged falsehood from the witness stand was material, in the statutory sense, in the trial of Buck Laubaugh, nor is the subject discussed in the brief filed in her behalf. In oral argument, however, appellant's counsel made the point, and we consider it a serious one which requires consideration.

---

[2] "FBI Washington Field
"S. A. C., DALLAS and SAN ANTONIO, TEXAS
"Chalmers Howard Laubaugh, with alias (Buck), Nelson Otis Sipe (with aliases); Shirley Estelle Shelton (with aliases) victim kidnapping white slave traffic act."
"Secure signed statement from Mary Pyle, known prostitute, believed employed Texas Steak House, with Sister Audrey, Brownsville, Texas, re her complete knowledge of activities of subjects and victim and the fact that Laubaugh transported Pyle to and from Texas to Washington, D. C., upon several occasions. Mary Pyle witnessed assault by Laubaugh on Eddie Daymude in apartment of subject Sipe on or about August 31 last, after both subjects had brought victim back from Anderson, Indiana. Laubaugh at that time alleged to have made threats against lives of victim and Daymude. Mary Pyle lived with Laubaugh in Washington, D. C., as man and wife. Ascertain addresses in Washington where they resided and conditions existing during this cohabitation. Determine if Laubaugh claimed Shirley Shelton as his wife, did he indicate he intended to divorce second wife and any pertinent dates recalled. Mary Pyle supposedly had informed her parents who reside rural route 1, Augusta, Texas, she was married to Laubaugh and Laubaugh visited at home of Pyle holding himself out as her husband. Mary Pyle's parents wrote to her as Mrs. C. H. Laubaugh. Interview parents and determine all addresses in Washington to which they directed letters. Question Mary Pyle as to names and locations of any prostitutes she may know who were working for Sipe or Laubaugh either past or present. Secure all information re beating of girls working for either subject and reason for beating. Also what clothes and money furnished Pyle by Laubaugh. Mary Pyle described twenty-five, five feet five inches, one-hundred twenty pounds, light brown to blond hair, gold crown edge of front tooth. Submit teletype and expedite report as subjects are in custody."
"Hottel."
[3] Title 22, § 1001, D.C.Code (1940).
[4] 69 App.D.C. 135, 99 F.2d 368, 369.
[5] Murray v. U. S., 53 App.D.C. 119, 288 F. 1008, Bostic v. U. S., 68 App.D.C. 167, 94 F.2d 636.

██ Perjury is committed when one states, contrary to his oath, any material matter which he does not believe to be true. So reads the statute.[6] While the assignment of perjury on which a conviction is asked must be a matter which was material to the issue, tending to prove a fact bearing on such issue,[7] the materiality need not be immediate; it is sufficient if the false testimony gives weight to or detracts from testimony as to the material facts in issue. In Blackmon v. United States, 5 Cir., 108 F.2d 572, 573, it was said that "The materiality required is not as to any particular issue in the case, but as to the trial as a whole, that is, materiality is determined by whether the false testimony was capable of influencing the tribunal in the issue before it." Wharton says, "The test is, was the evidence such as apparently conduced to support an hypothesis logically pertinent to the issue?"[8] If not, Wharton concludes that it was not material.

██ Laubaugh was being tried for unlawfully transporting Shirley Shelton on August 29, 1944. The material fact in issue was whether he had so transported the Shelton girl. Mary Pyle testified against him, saying that he had transported Shirley; in that respect her testimony did not vary from her written statement of September 18, 1944. She is charged with perjury for having falsely testified that the written statement was involuntarily given. This false statement was not perjury unless it was somehow material to the issue as to the guilt or innocence of Laubaugh. The writing of September 18 charged him with guilt; consequently, Mary Pyle's statement from the witness stand that the writing was not given voluntarily would have been material to the issue as to Laubaugh's guilt, except for the fact that from the witness chair Mary charged him with guilt exactly as she had done in the writing. If, as a witness, she had repudiated the accusation of transporting Shirley which appeared in her written statement, then her testimony that she signed the writing because of the threats of the agents would have tended to reduce or minimize the government's case against Laubaugh; and her testimony that the writing was involuntarily signed, if proved false, would have amounted to perjury. But, as she repeated under oath what she had said in the September statement as to Laubaugh's guilt of transporting Shirley Shelton, her false statement that the writing was not voluntary could have had no effect on the jury's decision as to the main issue, nor as to any collateral issue.

As we have seen, her testimony varied somewhat as to details from the statements contained in the writing; but as to whether Laubaugh had transported Shirley, there was no variance. The government made no effort to prove false those portions of the appellant's testimony which differed from her written statement. Indeed, the indictment did not charge her with swearing falsely in those particulars. For example, whether Mary Pyle paid the rent on her Washington apartment, as she testified that she did, or whether Laubaugh paid it for her, as her written statement said, was not pertinent to the issue being tried. It is our view, therefore, that the false statement attributed to the appellant was in no way material in the case in which she made it and did not constitute perjury within the meaning of the statute.

Reversed.

---

[6] § 22—2501 (D.C.Code, 1940):
"Every person who, having taken an oath or affirmation before a competent tribunal, officer, or person, in any case in which the law authorized such oath or affirmation to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed is true, wilfully and contrary to such oath or affirmation states or subscribes any material matter which he does not believe to be true, shall be guilty of perjury; and any person convicted of perjury * * * shall be punished by imprisonment in the penitentiary for not less than two nor more than ten years."

[7] Wharton's Criminal Law (Twelfth Edition) § 1542.

[8] Id. at § 1543.