Alton L. SMITH and Tela N. Thompson, Appellants,

v.

UNITED STATES, Appellee.

Nos. 10–CF–612, 10–CF–747.

District of Columbia Court of Appeals.

Argued Nov. 29, 2012.

Decided June 6, 2013.

Bruce A. Johnson, Jr., Bowie, for appellant Alton L. Smith.

Deborah A. Persico, for appellant Tela N. Thompson.

Angela G. Schmidt, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Mary B. McCord, Assistant United States Attorney, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and NEBEKER, Senior Judge.

1. D.C.Code § 22–722(a)(2)(A) (2001).

2. D.C.Code § 22–2603 (2001) (amended 2009).

3. D.C.Code § 22–2402(a)(1) (2001).

4. D.C.Code § 22–722(a)(6) (2001).

5. Appellant Thompson adopts appellant Smith's arguments regarding the jury instructions and the contraband message statute.

NEBEKER, Senior Judge:

On March 22, 2010, a jury found appellant Alton L. Smith guilty of obstructing justice [1] and two counts of introducing contraband into a penal institution,[2] and appellant Tela N. Thompson guilty of introducing contraband into a penal institution, three counts of perjury,[3] and obstructing justice.[4] Appellant Smith argues on appeal that (1) the trial court erred in defining "contraband messages" in its jury instructions, (2) the contraband message statute is unconstitutionally vague, and (3) his conviction for obstruction of justice was against the weight of the evidence. Appellant Thompson argues that there was insufficient evidence to support her perjury and obstruction of justice convictions.[5] We disagree and affirm.

**Factual Overview** [6]

On January 21, 2009, Tony Stover went to his neighbors' apartment and spoke with Akia Smith,[7] regarding his missing property.[8] Mr. Stover told Akia that he believed her family had his DVD player and she asked him to return later when he could speak with her father, William Smith. Later that same evening, Mr. Stover and his friend, Janazzo Boyd, returned to the Smith family apartment in order to speak with William. William assured the men that the property would be returned.

After speaking with William, Mr. Stover and Mr. Boyd exited the apartment build-

6. Additional facts necessary to address particular issues will be highlighted in the applicable portions of the opinion.

7. In order to avoid confusion, members of the Smith family, other than appellant, will be referred to by first name.

8. Mr. Stover had been told by another resident of the building that his neighbors, the Smiths, might have been involved in the burglary of his apartment.

ing and were walking toward Maryland Avenue when a man, whom Mr. Stover later described to the police as light-skinned, wearing dark clothing, and having dreadlocks and a tattoo on his face, began shooting a gun in their direction.[9] Mr. Stover ran away from the shooter and approached a police cruiser for assistance. Mr. Stover described the shooter and told the police officers about his confrontation with the Smiths just before the shooting.

The police officers went to Mr. Stover's apartment building and saw an individual inside the building running past a window. One officer ran in the same direction as that individual and ended up at the Smith's apartment. A second officer went to the rear of the building and heard a commotion on the top floor. He testified that when he looked up he saw the outline of a person inside an open window, which was later identified as a window in the Smith's apartment, from which the screen was bent out. The officer looked down and saw a silver handgun on the ground in front of the window.[10] The officer looked back up at the window and saw "a hand pulling the screen back in." The officers searched and secured the apartment, and noticed that appellant Smith matched the description of the alleged assailant. The police officers conducted a show-up identification during which Mr. Stover identified appellant Smith as the shooter.[11] Appellant Smith was arrested and detained pending trial.

On March 17, 2009, appellant Thompson testified at a grand jury that was investigating the shooting that she and appellant Smith were in the middle bedroom during the night of the shooting. She testified that she did not hear the gunshots, but was aware of the shooting because others in the apartment heard the gunshots and began yelling, at which point she and appellant Smith went into the living room.

On March 2, 2010, Louis Hicks, who was present at the Smith family apartment at the night of the shooting, testified at trial that he was in the living room when Mr. Stover entered to discuss the missing DVD player. Mr. Hicks testified that appellant Smith was in the living room at some point during this discussion, and soon after Mr. Stover left the apartment, appellant Smith and his brothers, Adrien and Arnell Smith, left the apartment. According to Mr. Hicks, Adrien returned to the apartment before he heard gunshots. After Mr. Hicks heard the gunshots he ran and hid in the bathroom. Once he returned to the living room he saw appellant Smith and Arnell in the apartment.

During trial, Mr. Stover recanted his identification and insisted that he did not see the person who shot at him.[12] The government asked about his grand jury testimony, in which he identified appellant Smith as the shooter, and Mr. Stover replied that the "government made me believe that that's who it was, so that's what I ran with." Akia testified that she was in the living room when she heard the gunshots. She stated that she did not see anyone leave or enter the apartment after

9. Mr. Stover also told the police officers that he was shooting with his left hand.

10. Mr. Stover identified the gun at trial and the parties stipulated that the cartridges recovered from the front of the apartment building were fired by the gun found at the back of the building.

11. The police first brought out appellant Smith's brother, Arnell Smith, and Mr. Stover stated that he was not the shooter.

12. Mr. Boyd testified at trial that he was not sure who fired the shots. When the police showed Mr. Boyd a photo array of suspects soon after the shooting he was unable to identify the shooter.

Mr. Stover left, and she thought that appellant Smith was in the living room when she heard the gunshots. When she went into the middle bedroom to check on her four children neither appellant Smith nor appellant Thompson was in the bedroom.

During Appellant Thompson's grand jury testimony in March 2009 she stated that the only number that appellant Smith had contacted her at since he had been in jail was her house phone number. She also testified that appellant Smith never contacted her from a cell phone while he was in prison. During the trial, the government produced cell phone records that showed that a cell phone recovered in prison made approximately 859 phone calls to a cell phone belonging to appellant Thompson. The cell phone recovered in prison was confiscated by prison staff, and its number was identified as appellant Smith's cell phone number by several witnesses, including his girlfriend, Chari Thompson. Chari Thompson testified that she communicated by cell phone with appellant Smith while he was in prison and that appellant Smith possessed a cell phone in prison. William testified that appellant Smith had called him from prison on a cell phone, but he did not know if appellant Smith ever spoke to appellant Thompson from the cell phone.

Appellant Smith testified at trial that he had called appellant Thompson from a cell phone while he was in prison, but appellant Thompson did not know he was calling her from a cell phone.[13] He also denied ever receiving phone calls from appellant Thompson on the cell phone recovered in the prison. He testified that he did not recognize the cell phone number belonging to appellant Thompson, even after the prosecutor presented a recorded phone conversation between appellant Thompson and appellant Smith where appellant Smith called appellant Thompson on that cell phone number from a prison phone. Appellant Smith also testified that Mr. Stover's brother, Marcel, who was on the same cellblock, did not tell him that Mr. Stover was in protective custody, and did not give him Mr. Stover's cell phone number.

## Analysis

### A. The Contraband Message Statute

#### 1. Definition of "Contraband Message" in the Trial Court's Jury Instructions

On February 17, 2010, the government submitted a memorandum of law and proposed jury instruction for the charge against both defendants of introducing contraband into a penal institution.[14] In its memorandum, the government proposed as the definition of "contraband message" "a message conveyed by any means not authorized by the D.C. Department of Corrections."[15] The government

13. Appellant Smith testified that he did not have his own cell phone, but that "basically everybody had a cell phone." He testified that he was never told it was a crime to use a cell phone, but that "you don't sell cell phones on commissary."

14. At the time of the offense, the statutory provision in question, D.C.Code § 22–2603 (2001) (amended 2009), read as follows: "Any person, not authorized by law, or by the Mayor of the District of Columbia, or by the director of the Department of Corrections of the District of Columbia, who introduces or attempts to introduce into or upon the grounds of any penal institution of the District of Columbia ... any narcotic drug, weapon, or any other contraband article or thing, or any contraband letter or message intended to be received by an inmate thereof, shall be guilty of a felony...."

15. It is not necessary to address whether appellant had fair notice under the due process clause of Fifth Amendment as it was not raised on appeal, and, regardless, appellant

explained at a hearing on the same day that its definition was consistent with the statute's purpose of maintaining prison security. Counsel for appellant Thompson suggested that the definition of "contraband message" should have "a content element to it." On March 9, 2010, the court found that the government's interpretation was reasonable and ruled that it would instruct the jury using the government's proposed instructions and definition.[16] Defense counsel objected, thus preserving their challenge to the jury instruction.[17]

■ The trial court's instruction, if error, is subject to harmless error review. *Neder v. United States,* 527 U.S. 1, 9–10, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). If the trial court's error affected the defendants' constitutional rights, as alleged, then "the defendant's conviction may stand only if the error was harmless beyond a reasonable doubt." *McDonald v. United States,* 904 A.2d 377, 380 (D.C.2006) (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

Here, appellants argue that the trial court erred in its jury instruction for three central reasons. First, appellants argue that the trial court's definition of contraband was inconsistent with the common law use and established meaning of the term contraband. Second, appellants argue that the trial court's definition is illogical as the legislature did not intend to create such a harsh punishment for communicating with a prisoner, and

finally appellants argue that the trial court's definition ignores the First Amendment implications imposed by such an interpretation. We do not find these arguments to be persuasive.

■ "Statutory interpretation is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *Cook v. Edgewood Mgmt. Corp.,* 825 A.2d 939, 946 (D.C.2003) (internal quotation marks and citation omitted). "Generally speaking, if the plain meaning of statutory language is clear and unambiguous and will not produce an absurd result, we will look no further." *Hood v. United States,* 28 A.3d 553, 559 (D.C.2011) (internal quotation marks and citation omitted). "[I]n examining the statutory language, it is axiomatic that [t]he words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc) (internal quotation marks and citation omitted).

Here, the term "contraband message" is not defined by statute. Thus, we look to its ordinary meaning or common use. *See Hood, supra,* 28 A.3d at 559. ("The word 'visible' is not defined in the statute, but we do not find it to be ambiguous. It is not a technical term, and therefore we presumptively should construe it according to its meaning in ordinary or common

---

Smith admitted that he knew the possession of a cell phone was against prison regulations.

**16.** The jury instruction stated: "A message is a written or oral communication. A contraband message is a message conveyed by any other means not authorized by the D.C. Department of Corrections. The D.C. Department of Corrections does not authorize the use of cellular telephones by inmates. Any written or oral communication conveyed via

cellular phone by or to an inmate is a contraband message."

**17.** *See* Super. Ct.Crim. R. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.").

speech. For that meaning we may look to the dictionary."). The dictionary defines the adjective form of contraband as "prohibited or excluded by law or treaty," and lists "forbidden" as a synonym. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 494 (1993). Thus, a contraband message is a forbidden message, or a message that is prohibited or excluded by law.

█ It would be nonsensical to require a content element as the appellants suggest. The purpose of the legislation is to ensure the maximum degree of security when it comes to interactions between the outside world and the confines of prison. *See, e.g.*, S.REP. No. 77–860 (1941). Even an innocuous message cannot be passed through a forbidden channel of communication into a prison. If this were permitted, illicit communications might reach inmates under the guise of a seemingly harmless message. In order to ensure the proper administration of the prisons, it is necessary for prison officials to monitor communications with the outside world. We find that the trial court's definition of "contraband message" as "a message conveyed by any other means not authorized by the D.C. Department of Corrections" is consistent with that goal.

█ Furthermore, it is well settled that the legislature is in a better position than the courts to determine the seriousness of an offense. *See, e.g., Blanton v. City of N. Las Vegas,* 489 U.S. 538, 541–42, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989) ("The judiciary should not substitute its judgment as to seriousness for that of a legislature, which is far better equipped to perform the task

and [is] likewise more responsive to changes in attitude and more amenable to the recognition and correction of their misperceptions in this respect." (internal quotation marks and citation omitted)). Appellants' argument that the legislature has since amended D.C.Code § 22–2603 to provide a maximum sentence of two years' incarceration for use of an unauthorized cell phone is not persuasive.[18] "Subsequent legislation which declares the intent of an earlier law is not, of course, conclusive in determining what the previous Congress meant." *Federal Hous. Admin. v. Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); *see also Jackson v. District of Columbia Bd. of Elections & Ethics,* 999 A.2d 89, 106–08 (D.C. 2010) (discussing discerning the intent of previous City Council legislation from subsequent legislation). Even where the legislature has clarified and defined a phrase left undefined in a previous statute, this court has declined to give deferential treatment to the retroactive statutory expression of intent. *See West End Tenants Ass'n v. George Washington Univ.,* 640 A.2d 718, 731–32 (D.C.1994).

█ Finally, it is well-settled that prisoners have reduced First Amendment rights.[19] *See, e.g., Searcy v. United States,* 668 F.Supp.2d 113, 122 (D.D.C.2009) ("Inmates retain protections afforded by the First Amendment, *see Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), but it is settled that the fact of confinement as well as the legitimate goals and policies of the penal institution limit these retained constitutional rights." (internal quotation marks

---

18. *See* D.C.Code §§ 22–2603.01(3)(A)(iii), 22–2603.03(b) (2012 Supp.). Under the previous version of D.C.Code § 22–2603 (2001), the maximum sentence for violating the statutory provision was ten years incarceration.

19. It is not necessary to inquire into appellant Smith's standing to raise this First Amendment issue because the record shows numerous phone calls exchanged between appellant Thompson and appellant Smith. As the sender of the message, appellant Smith has standing to raise this constitutional challenge.

and citation omitted)). The corrections facilities' internal security is central to all other corrections goals and must be considered when assessing a challenge to prison regulations based on a First Amendment violation. *Pell, supra,* 417 U.S. at 823, 94 S.Ct. 2800. Here, the need for prison officials to monitor communications trumps any alleged First Amendment right as alternative means of communication remain. *See id.* at 824, 94 S.Ct. 2800 (considering alternative means of communication available such as through standard mail); *see also Procunier v. Martinez,* 416 U.S. 396, 412–13, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) ("[T]he legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence."). For these reasons, we find no error in the trial court's definition of "contraband message."

## 2. Vagueness

■■■ Appellants also fail on their vagueness challenge.[20] "The Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution have been construed as requiring that notice be given of the conduct proscribed by criminal statutes." *McNeely v. United States,* 874 A.2d 371, 381 (D.C.2005). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). "[H]owever, a statute is not unconstitutionally vague even if it requires that a person's conduct conform to a somewhat amorphous—yet comprehensible—standard; it is unconstitutionally vague only if

no standard of conduct is specified at all." *McNeely, supra,* 874 A.2d at 382 (internal quotation marks and citations omitted). Furthermore, "[c]ourts are under a general obligation to interpret statutes so as to support their constitutionality." *District of Columbia v. Gueory,* 376 A.2d 834, 836 (D.C.1977). "This is equally true when … a statute is attacked on … vagueness grounds under the Fifth Amendment." *Id.*

■■■ Appellants argue that the statute does not provide fair notice of what conduct was prohibited, as made evident by "the substantial confusion expressed by defense counsel, the prosecutor, and Judge Keary in interpreting what conduct was prohibited pursuant to the contraband messages provision." However, the statute is not vague on its face. "It is, by its terms, aimed at certain limited conduct which is constitutionally subject to restraint." *Leiss v. United States,* 364 A.2d 803, 806 (D.C.1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). "The type of conduct subject to its sanctions is clearly identified in words of common understanding, with little room for misinterpretation or conjecture." *Id.* As the Supreme Court has stated, "[t]he root of the vagueness doctrine is a rough idea of fairness." *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). Its purpose is not "to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Id.*

Here, appellants knew that communicating on a cell phone violated prison regulations. Appellant Smith testified during

---

**20.** The government argues that appellants waived their claim by failing to raise it pretrial. We do not need to determine whether the argument was waived as we find the statute is not vague.

trial that he was aware that "you don't sell cell phones on commissary." In a recorded call from a jail phone, appellants also express knowledge that use of a cell phone was not permitted by carefully alluding to appellant Smith's cell phone instead of directly using the word "cell phone." [21] Read in context of the purpose of the statute, which is to prohibit the introduction of contraband into a prison, we find that this provision is not vague and thus we affirm appellants' convictions for introducing contraband into a prison.

### B. Sufficiency of the Evidence

 When reviewing the sufficiency of the evidence, this "court must deem the proof of guilt sufficient if, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (internal quotation marks and citation omitted). This standard recognizes "the province of a trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony." *Dickerson v. United States*, 650 A.2d 680, 683 (D.C.1994). "The evidence is insufficient, however, if in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Roy v. United States*, 652 A.2d 1098, 1103 (D.C.1995) (internal quotation marks and citation omitted). To prevail, appellants must establish "that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Carter v. United*

*States*, 957 A.2d 9, 14 (D.C.2008) (internal quotation marks and citation omitted).

### 1. Appellant Smith's Conviction for Obstruction of Justice

In order to convict appellant Smith of obstructing justice, the government was required to prove that (1) Mr. Stover was a witness in a proceeding in a court of the District of Columbia, (2) appellant Smith knew or believed that Mr. Stover was a witness, (3) appellant Smith willfully and knowingly threatened or corruptly persuaded Mr. Stover by threatening letter or communication, and (4) appellant Smith did so with intent to influence, delay or prevent Mr. Stover's truthful testimony in that proceeding. D.C.Code § 22–722(a)(2)(A) (2001). Appellant Smith contends that the government failed to meet its burden because it did not present actual evidence that he contacted Mr. Stover, and because there was substantial evidence suggesting that Mr. Stover changed his testimony because of a genuine concern that he had misidentified appellant Smith as his assailant.

Appellant Smith's arguments are not persuasive. The government presented sufficient evidence so that a rational jury could have found the four essential elements of the crime beyond a reasonable doubt. Mr. Stover was a witness in a grand jury investigation. Immediately after the shooting, Mr. Stover provided the police with a detailed description of the person who had shot at him, and identified appellant Smith in a show-up procedure and a video-taped police interview. At the grand jury proceeding on February 26, 2009, Mr. Stover again identified appellant

---

**21.** Instead of asking appellant Smith if his cell phone was charging, appellant Thompson asked Smith, in a recorded jail phone conversation, "which thing did you call me off of?" and "where's it now?" to which Smith replied

"I got that. It's ... regenerating." This language implies that appellants were avoiding the use of the words "cell phone" or "charging" to avoid detection.

Smith as his assailant. On March 19, 2009, appellant Smith placed a recorded call to his father's cell phone number in which he stated that he needed to contact his private investigator who needed to get an affidavit "before they get Slim to . . . go to the grand jury." Appellant Smith also stated that "he in protective custody"[22] and "if he go to the grand jury . . . I'm going to need everybody . . . so I can fight this. . . ."

Half an hour after placing the phone call to his father's cell phone, at least three calls were made from the cell phone recovered in prison to Mr. Stover's cell phone number. On March 21, 2009, in a period of approximately forty-five minutes, several calls were exchanged between the cell phone recovered in prison, Mr. Stover, and Andrea Wright, appellant Smith's investigator.[23] Over the phone, Mr. Stover told Ms. Wright that he had identified the wrong man as the shooter and the authorities would not listen to him. Mr. Stover, Ms. Wright and appellant Smith's attorney met on March 22, 2009, and Mr. Stover repeated that he had identified the wrong man. He stated he was certain because he had recently seen the person who shot at him on the street.[24] At trial, Mr. Stover recanted his identification, stating that he did not see the person shooting at him and did not remember what the shooter looked like.

■■■ Ordinarily, the intent to intimidate or influence a witness "must be inferred from the context and nature of the alleged criminal conduct." *McBride v. United States*, 393 A.2d 123, 131 (D.C.

1978), *cert. denied*, 440 U.S. 927, 99 S.Ct. 1260, 59 L.Ed.2d 482 (1979). Furthermore, "that the case may rest on circumstantial evidence is of little consequence if the evidence is such that it may reasonably convince a trier of fact beyond a reasonable doubt." *Gayden v. United States*, 584 A.2d 578, 580 (D.C.1990) (internal quotation marks and citation omitted), *cert. denied*, 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991). "And the government's evidence need not negate every possible inference of innocence to support a guilty verdict." *Campos–Alvarez v. United States*, 16 A.3d 954, 964 (D.C.2011) (internal citation omitted).

■■■ There was sufficient evidence here, based on the call patterns and the testimony, for the jury to infer that appellant Smith used the cell phone found in prison and contacted Mr. Stover to persuade him to change his testimony. *See, e.g., Smith v. United States*, 837 A.2d 87, 92–94 (D.C.2003) (finding that a reasonable juror could have found that the appellant attempted to influence a juror when he addressed her by the wrong name outside the courthouse and told her "to remember to say not guilty" in the trial), *cert. denied*, 541 U.S. 1081, 124 S.Ct. 2435, 158 L.Ed.2d 996 (2004); *Irving v. United States*, 673 A.2d 1284, 1289 (D.C.1996) (finding that the obstruction of justice statute "merely requires that the defendant have made 'any effort or essay to accomplish the evil purpose that the [statute] was enacted to prevent.'" (quoting *United States v. Russell*, 255 U.S. 138, 143, 41 S.Ct. 260, 65

22. The government had moved Mr. Stover to a hotel after the shooting, and Mr. Stover later moved to a new neighborhood.

23. Ms. Wright had left her business card with Mr. Stover.

24. At trial, Mr. Stover testified that he did not recall speaking with appellant Smith or calling Ms. Wright. He also testified that he did not recall telling Detective Nasr before the trial that "he received a phone call that he believed to have originated from jail, in which the caller told him to change his story, to state that he got the identification wrong."

L.Ed. 553 (1921))). The jury was not obliged to believe Mr. Stover's recantation and his claim at trial that he did not see the person who shot at him. *See, e.g., Campos–Alvarez, supra,* 16 A.3d at 965–66 ("The jury was not obliged to credit Morales's account that Campos sincerely wanted Loza to 'go to court and do what he got to do' if he was certain that her brother shot him."). Thus, we affirm appellant Smith's conviction for obstruction of justice.

2. Appellant Thompsons' Convictions for Perjury and Obstruction of Justice

A. Perjury

 In order to convict appellant Thompson of perjury, the government had to show that she "made a false statement of material fact under oath with knowledge of its falsity." *Gaffney v. United States,* 980 A.2d 1190, 1193 (D.C.2009); *see also* D.C.Code § 22–2402 (2001). In order to prove materiality the government must show that the statement "has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed." *Kungys v. United States,* 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (internal quotation marks and citation omitted). Under the two-witness rule, the government must present either two witnesses to testify as to the falsity of the statement, or one witness plus independent corroborative evidence. *Hsu v. United States,* 392 A.2d 972, 980–81 (D.C.1978). "[T]he independent, corroborative evidence need not be sufficient, by itself, to demonstrate guilt; rather, it need only tend to establish an accused's guilt and be inconsistent with the innocence of the defendant when joined with the one direct witness's testimony." *Id.* (internal quotation marks and citation omitted).

 Appellant Thompson argues that the government failed to meet its burden on all three charges of perjury. She argues that there was insufficient evidence to show that she knowingly testified falsely that appellant Smith was in the bedroom with her at the time of the shooting. Additionally, she argues that there was both insufficient evidence to show that her allegedly false statements regarding appellant Smith's use of a cell phone in prison, and the fact that he called her on her cell phone were material to the grand jury investigation, and that they were false.

Appellant Thompson's arguments are not persuasive. First, as to her conviction for perjury regarding appellant Smith's location during the shooting, during the trial there were several witnesses whose testimony directly contradicted appellant Thompson's testimony. During the grand jury proceedings, Mr. Stover testified that appellant Smith shot him. During trial, Mr. Hicks testified that after Mr. Stover left the apartment, appellant Smith and his brothers, Adrien and Arnell, went outside. Adrien returned before the shots were fired, but Mr. Hicks only saw appellant Smith and Arnell return to the apartment after the shots were fired. Akia testified that when she went into the middle bedroom to check on her children, where appellant Thompson testified that she and appellant Smith were located, she did not see either appellant in the room.

Appellant Thompson asserts that this testimony does not reach the evidentiary minimum imposed by the two-witness rule in order for the government to meet its burden of proving falsity. "The 'two-witness' label is really a misnomer, as the rule can be satisfied with circumstantial evidence alone, or with one direct witness to the falsity of the accused's testimony, plus independent corroborative evidence." *Murphy v. United States,* 670 A.2d 1361,

1365 (D.C.1996) (citing *Boney v. United States*, 396 A.2d 984, 986 n. 2 (D.C.1979)). The government used the testimony of two witnesses at trial to support the falsity of appellant Thompson's statement, as well as the grand jury testimony of a third witness. We find that there was sufficient evidence to satisfy the two-witness rule. *See Murphy, supra,* 670 A.2d at 1366–67 (holding that there was sufficient evidence to convict for perjury).

■■■■■ As to appellant Thompson's perjury convictions that relate to appellant Smith's use of a cell phone, the government has also satisfied its burden of proving materiality and falsity of her statements.[25] The materiality requirement relates not to a particular issue in the case, but as to the trial as a whole. *Pyle v. United States,* 81 U.S.App.D.C. 209, 213, 156 F.2d 852, 856 (1946). "Materiality must be judged by the facts and circumstances in the particular case." *Weinstock v. United States,* 97 U.S.App. D.C. 365, 368, 231 F.2d 699, 702 (1956). The question to be answered is "whether the false testimony was capable of influencing the tribunal in the issue before it." *Id.* (internal quotation marks and citation omitted).

At the time of appellant Thompson's grand jury testimony, the grand jury knew several family members and friends were present in the Smith family apartment during the shooting, and that there was conflicting testimony regarding the location of appellant Smith. Furthermore, appellant Thompson had admitted to providing a false alibi for appellant Smith when she was interviewed at the police station.[26] Thus, any contact, and the manner in which that contact was made, between appellant Thompson and appellant Smith while he was in prison could reasonably be considered material to the grand jury investigation. *Cf. Weinstock, supra,* 97 U.S.App.D.C. at 368, 231 F.2d at 702 (stating "[w]e think no tribunal ... would have been influenced in the slightest by the name by which the committee was known" when the issue posed was "whether the committee was a continuous organization"); *United States v. Lattimore,* 94 U.S.App.D.C. 268, 288, 215 F.2d 847, 867 (1954) ("It is one thing to say that if a committee were authorized to investigate pneumonia, the life-long clinical history of a man believed to have had pneumonia might be pertinent to the inquiry. It would be quite another thing to say that if he testified he had six colds in one winter ten years ago, whereas in fact he had only five, he could be indicted and punished for perjury."). During the grand jury investigation in which appellant Smith was a prime suspect, appellant Thompson falsely testified as to how appellant Smith contacted her from prison, a conversation in which they presumably discussed the pending investigation. Thus, we find her allegedly false testimony to be material.

■■■■ Appellant Thompson also argues that the government failed to prove that the statements she made regarding the

25. The government argues that appellant Thompson did not preserve her sufficiency argument on the perjury counts relating to the phones and thus asserts that this court should review her claim only for plain error. Appellant Thompson responds that the claims were preserved as she simply argued another aspect of insufficient evidence on appeal. Regardless of the standard of review, Ms. Thompson's arguments fail.

26. That evening at the police station, appellant Thompson lied to the police and told them that appellant Smith's first name was Antwon, her first name was Asia, and she was related to appellant Smith's sister Akia. She also told the police officers that appellant Smith was not in the apartment on the night of the shooting.

cell phone usage were false. This court has held that "circumstantial evidence may be used as the sole evidence against a defendant in a perjury case." *Boney, supra,* 396 A.2d at 987. "Moreover, some cases are particularly susceptible to the use of circumstantial evidence." *Id.* "[W]here the perjury relates to the accused's state of mind, such as what he knew ... proof can only be made by proof of facts from which the jury will infer that the accused [m]ust have known ... what he had denied knowing...." *Id.* (internal quotation marks and citation omitted).

 Here, a reasonable jury could have found that appellant Thompson's statements were false. Circumstantial evidence included the recorded jail call in which appellant Thompson asks appellant Smith which thing he is calling from, the phone records of hundreds of calls that appellant Thompson received on her cell phone from the cell phone recovered in prison, text messages initiated by appellant Thompson to the cell phone recovered in prison, and the testimony of appellant Smith's father and appellant Smith's girlfriend that appellant Smith had a cell phone in jail. For these reasons, we affirm appellant Thompson's convictions for perjury.

## B. Obstruction of Justice

 In order to convict appellant Thompson of obstruction of justice, the government had to show that she (1) obstructed or impeded or endeavoured to obstruct or impede the due administration of justice in an official proceeding, and (2) did so with the intent to undermine the integrity of the pending investigation. D.C.Code § 22–722(a)(6) (2001). "The intent required for obstruction of justice often 'must be inferred from the context and nature of the alleged criminal conduct.'"

*Campos–Alvarez, supra,* 16 A.3d at 965 (quoting *McBride, supra,* 393 A.2d at 131).

Appellant Thompson argues that the government failed to meet its burden on her obstruction of justice charge as her conviction is directly dependent on her convictions for perjury, and the government failed to meet its burden on those charges. As stated *supra,* we affirm appellant Thompson's convictions for perjury, thus we affirm her conviction for obstruction of justice.

Accordingly, appellant Smith's and appellant Thompson's convictions are affirmed.

*So ordered.*